# 26-1782

## United States Court of Appeals for the Second Circuit

CLAUDIA BORECKY, MARIATERESA THIERY,

*Plaintiffs-Appellees,*

-against-

COUNTY OF NASSAU, BRUCE BLAKEMAN, IN HIS OFFICIAL CAPACITY AS COUNTY EXECUTIVE OF THE COUNTY OF NASSAU, PATRICK J. RYDER, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE NASSAU COUNTY POLICE DEPARTMENT,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLANTS

ABRAMS FENSTERMAN, LLP
*Attorneys for Defendants-Appellants*
81 Main Street, Suite 400
White Plains, New York 10601
(914) 607-7010
rspolzino@abramslaw.com

5445

ELECTRONIC PARALEGAL

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........ 1

JURISDICTIONAL STATEMENT ........ 4

ISSUES PRESENTED ........ 4

STATEMENT OF FACTS ........ 5

A. The Religious Safety Act ........ 5

B. The context of the RSA's enactment ........ 7

C. Plaintiffs and their planned activities ........ 9

D. Prior proceedings ........ 9

SUMMARY OF ARGUMENT ........ 10

STANDARD OF REVIEW ........ 15

ARGUMENT ........ 16

I. Plaintiffs failed to establish Article III standing for preliminary relief ........ 16

A. Plaintiffs had to prove standing on the preliminary injunction record ........ 16

B. Plaintiffs did not establish a credible threat under the RSA's complete operative conditions ........ 17

C. The mistaken December cancellation cannot supply the missing proof of prospective injury ........ 20

D. Standing to challenge the Bubble Provision cannot simply be borrowed from the fixed buffer ........ 21

II. The District Court's analysis of the merits rests on legal errors that independently require reversal ....................23

A. The District Court found that the RSA is content neutral and serves a substantial government interest ....................23

B. The District Court understated the County's interest, which includes protecting the First Amendment rights of worshippers ....................24

C. The District Court gave inadequate weight to the record's access related risks and the County's preventive judgment ....................26

D. The District Court undervalued the RSA's preventive access function when assessing narrower alternatives ....................29

E. The RSA leaves ample alternative channels, and the District Court overstated its burden on Plaintiffs' speech ....................32

F. The bubble provision is constitutional under *Hill*, which remains binding ....................34

III. Facial invalidity was error under *Moody* and *Hansen* ....................37

A. Facial invalidation is an extreme remedy reserved for laws whose unconstitutional applications substantially outweigh their legitimate sweep ....................37

B. The District Court's imagined applications disregard statutory limits ....................38

C. The District Court refused narrowing constructions that precedent required it to consider ....................39

D. The District Court's conclusion that the RSA gives enforcing officers "unbridled discretion" is unsustainable ....................42

E. The RSA's plainly legitimate sweep defeats facial invalidation ....................44

IV. Any residual defect requires a separate severability analysis, not automatic suspension of the entire RSA ....................46

A. New York law and the express clause require preservation of a valid, independently operative remainder ........................................................46

B. The Bubble Provision stands on its own ................................................47

C. Objections to discrete text and applications require a focused remedial analysis..................................................................................................48

V. The County-wide injunction against the RSA is overbroad and the equities do not support it ..........................................................................................50

A. Any relief must be tailored to Plaintiffs and their conduct .......................50

B. The balance of equities and the public interest favor the County .............51

CONCLUSION ...........................................................................................................53

CERTIFICATE OF COMPLIANCE ..............................................................................54

## Table of Authorities

*Page(s)*

**Cases:**

*Agudath Israel of Am. v. Cuomo,*
983 F.3d 620 (2d Cir. 2020) ........................................................ 15

*Alaska Airlines, Inc. v. Brock,*
480 U.S. 678 (1987)........................................................................ 47

*Ayotte v. Planned Parenthood of N. New Eng,*
546 U.S. 320 (2006).................................................................. 47, 49

*Barr v. Am. Ass'n of Pol. Consultants, Inc,*
591 U.S. 610 (2020)........................................................................ 46

*Boos v. Barry,*
485 U.S. 312 (1988).................................................................. 14, 40

*Broadrick v. Oklahoma,*
413 U.S. 601 (1973)............................................................ 14, 37, 42

*Brown v. City of Pittsburgh,*
586 F.3d 263 (3d Cir. 2009) ........................................................ 48

*Burson v. Freeman,*
504 U.S. 191 (1992)............................................................ 23, 25, 28

*Cacchillo v. Insmed, Inc,*
638 F.3d 401 (2d Cir. 2011) ................................................... *Passim*

*Cameron v. Johnson,*
390 U.S. 611 (1968)........................................................................ 44

*Cerame v. Slack,*
123 F.4th 72 (2d Cir. 2024) ......................................................... 17

*Circuit City Stores, Inc. v. Adams,*
532 U.S. 105 (2001)........................................................................41

*City of Renton v. Playtime Theatres, Inc,*
475 U.S. 41 (1986)..........................................................................27

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)........................................................................20

*Cox v. Louisiana,*
379 U.S. 536 (1965)........................................................................43

*Cox v. Louisiana,*
379 U.S. 559 (1965)........................................................................43

*Cox v. New Hampshire,*
312 U.S. 569 (1941)........................................................................43

*CWM Chem Servs., L.L.C. v. Roth,*
6 N.Y.3d 410 (2006).......................................................................46

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006)........................................................................21

*Do No Harm v. Pfizer Inc,*
126 F.4th 109 (2d Cir. 2025) ..........................................................16

*Eisenhauer v. Culinary Institute of America,*
84 F.4th 507 (2d Cir. 2023) ............................................................40

*Frisby v. Schultz,*
487 U.S. 474 (1988)..............................................................14, 26, 40

*FW/PBS, Inc. v. City of Dallas,*
493 U.S. 215 (1990)..............................................................11, 15, 16

*Grayned v. City of Rockford,*
408 U.S. 104 (1972)........................................................................25

*Hedges v. Obama*,
724 F.3d 170 (2d Cir. 2013) ....................................................................22

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc*,
452 U.S. 640 (1981)..........................................................................26, 32, 44

*Hill v. Colorado*,
530 U.S. 703 (2000).............................................................................*Passim*

*Laird v. Tatum*,
408 U.S. 1 (1972)....................................................................................20

*Leavitt v. Jane L*,
518 U.S. 137 (1996)...........................................................................46, 48

*Long Island Vietnam Moratorium Committee v. Cahn*,
437 F.2d 344 (2d Cir. 1970) ....................................................................43

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)..................................................................................17

*Madsen v. Women's Health Center, Inc*,
512 U.S. 753 (1994)...........................................................................29, 48

*Marcavage v. City of New York*,
689 F.3d 98 (2d Cir. 2012) ..................................................................*Passim*

*Maryland v. King*,
567 U.S. 1301 (2012)................................................................................51

*Matter of Westinghouse Elec. Corp. v. Tully*,
63 N.Y.2d 191 (1984) ................................................................................46

*McCullen v. Coakley*,
573 U.S. 464 (2014).............................................................................*Passim*

*Members of the City Council of L.A. v. Taxpayers for Vincent*,
466 U.S. 789 (1984)...........................................................................37, 39

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024)........................................................................ *Passim*

*Morissette v. United States,*
342 U.S. 246 (1952)..........................................................................31

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc,*
883 F.3d 32 (2d Cir. 2018) ...............................................................15

*N.Y. ex rel. Spitzer v. Operation Rescue Nat'l,*
273 F.3d 184 (2d Cir. 2001) ...............................................................32

*N.Y. State Club Ass'n v. City of New York,*
487 U.S. 1 (1988)..............................................................................37

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co,*
434 U.S. 1345 (1977)..........................................................................51

*Nixon v. Shrink Missouri Government PAC,*
528 U.S. 377 (2000)...........................................................................27

*People ex rel. Alpha Portland Cement Co. v. Knapp,*
230 N.Y. 48 (1920).............................................................................46

*Picard v. Magliano,*
42 F.4th 89 (2d Cir. 2022) ...........................................................14, 51

*Price v. City of Chicago,*
915 F.3d 1107 (7th Cir. 2019) .............................................................34

*Reporters Committee for Freedom of the Press v. Rokita,*
147 F.4th 720 (7th Cir. 2025) ..............................................................43

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
592 U.S. 14 (2020)..............................................................................24

*Schenck v. Pro-Choice Network of Western N.Y,*
519 U.S. 357 (1997).......................................................................13, 30

*Sisters for Life, Inc. v. Louisville-Jefferson County*,
56 F.4th 400 (6th Cir. 2022) ........................................................................35

*Staples v. United States*,
511 U.S. 600 (1994)......................................................................................31

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998)..................................................................................15, 16

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)......................................................................................17

*Trump v. CASA, Inc*,
606 U.S. 831 (2025)................................................................................14, 50

*Turco v. City of Englewood, No. 22-2647*,
2024 WL 361315 (3d Cir. Jan. 31, 2024).......................................................34

*United States v. Hansen*,
599 U.S. 762 (2023)................................................................................*Passim*

*United States v. Williams*,
553 U.S. 285 (2008)......................................................................................38

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc*,
455 U.S. 489 (1982)......................................................................................39

*Virginia v. Hicks*,
539 U.S. 113 (2003)......................................................................................37

*Vitagliano v. County of Westchester*,
71 F.4th 130 (2d Cir. 2023) .....................................................................*Passim*

*Volokh v. James*,
2026 N.Y. Slip Op. 03913 (N.Y. June 23, 2026) ...........................................42

*Volokh v. James*,
148 F.4th 71 (2d Cir. 2025) ....................................................................42, 47

*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008)....37

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989).... *Passim*

*Welty v. Dunaway, No. 25-5738*,
2026 WL 2874671 (6th Cir. Sept. 24, 2026)....51

*Yates v. United States*,
574 U.S. 528 (2015)....41

**Rules, Laws & Statutes:**

18 U.S.C. § 248....8, 13, 25

28 U.S.C. § 1292....4

28 U.S.C. § 1331....4

28 U.S.C. § 1343....4

28 U.S.C. § 1367....4

42 U.S.C. § 1983....4

Fed. R. App. P. 4(a) ....4

Mass. Gen. Laws ch. 266, § 120E½(b)....31

N.Y. Penal Law § 15.15....31, 41

RSA § 2....5, 6, 41

RSA § 4.... *Passim*

RSA § 5....6

RSA § 6....14, 46, 48

## PRELIMINARY STATEMENT

In December 2025, following the attack at a Hanukkah celebration on Bondi Beach and an aggressive demonstration outside Park East Synagogue in Manhattan, the Nassau County Legislature unanimously enacted the Religious Safety Act, Local Law No. 6-2025 (the "RSA;" (SPA-1-3)). The RSA regulates the time, place, and manner of advocacy near houses of worship without regard to viewpoint or subject matter. Its "Buffer Provision" restricts specified expressive activities within 35 feet of entrances and driveways. Its "Bubble Provision" restricts knowingly approaching within 10 feet of another person entering or leaving a place of worship, without that person's consent, for specified expressive purposes within 100 feet of an entrance to a house of worship. Both provisions apply only during defined event windows and impose no liability until after receipt of a police instruction, warning, or order. (RSA § 4 (SPA-1-3)).

The District Court agreed that the RSA is content neutral and advances substantial government interests in public safety, access to worship, and religious liberty. (SPA-19, 21-24). It nevertheless preliminarily enjoined enforcement of the entire law against everyone across the County for any reason. That result reflects both an unduly expansive reading of the RSA and an unduly restrictive view of the County's authority to protect access to worship. The District Court treated purposeful approach restrictions as equivalent to exclusion zones, discounted the

preventive function of access rules, and counted incidental expression without giving effect to the statute's context and its express purpose. The governing cases require assessment of the RSA's actual operation and realistic applications.

Properly construed and assessed, the injunction should be reversed and both provisions should be sustained. Plaintiffs failed to establish Article III standing for preliminary relief under the RSA's complete operative terms and the District Court's decision rests on the following errors of statutory construction and constitutional analysis:

- The District Court gave insufficient weight to the fit between the access-related risks identified in the record and the RSA's concentration on entrances, driveways and event periods;
- The District Court assessed the burden of the fixed zone without adequately accounting for the activities, places, times, and notice conditions that delimit its operation and treated narrower conduct prohibitions as sufficiently protective without giving due weight to the different preventative function of an access rule;
- The District Court distinguished *Hill v. Colorado* without giving adequate effect to the Bubble Provision's purposeful approach requirement, consent exception, stationary speech, and limited approach distance;

- The District Court's facial analysis included incidental expression without adequately addressing the statutory context and, for the Bubble Provision, the requirement that the approach be made for a covered expressive purpose; and
- The District Court treated the warning requirement as an independent grant of standardless authority rather than a prerequisite established by the Legislature to protect against inadvertent violations.

Both provisions of the RSA should be sustained under the governing time, place, and manner analysis. Their complementary functions protect circulation at access points and reduce purposeful, unconsented encounters in the surrounding arrival area. Their geographic, temporal, consent, and warning receipt conditions preserve meaningful opportunities to reach willing listeners while limiting the circumstances in which covered conduct is prosecutable. The District Court's broader construction and assessment of the combined burden should not stand.

This Court should reverse the order and vacate the preliminary injunction in its entirety. The County seeks restoration of the RSA's two operative provisions to preserve the balance between County residents' right to freely access places of worship without disruption or harassment and the ability of County residents to peacefully engage in constitutionally protected speech as the Legislature intended.

## JURISDICTIONAL STATEMENT

Plaintiffs invoked the District Court's jurisdiction under 28 U.S.C. §§ 1331 and 1343, and asserted claims under 42 U.S.C. § 1983, with supplemental jurisdiction over state constitutional claims under 28 U.S.C. § 1367. Article III standing remains an independent jurisdictional requirement and is addressed below. On June 18, 2026, the District Court entered the memorandum and order granting Plaintiffs' motion for a preliminary injunction. (SPA-66). Defendants filed a notice of appeal on July 1, 2026, within the period prescribed by Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction over the interlocutory appeal under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1. Whether Plaintiffs established Article III standing on the preliminary injunction record under the RSA's actual distance, conduct, consent, event window, and police warning conditions, including standing to challenge each independently operative provision.

2. Whether both provisions of the RSA, evaluated under *Ward v. Rock Against Racism* and *McCullen v. Coakley*, are narrowly tailored to the substantial interest the District Court recognized and leave ample alternative channels for communication.

3. Whether *Hill v. Colorado* and *Vitagliano v. County of Westchester* support the Bubble Provision's consent-based, 10-foot restriction on purposeful approaches, including when considering its operation alongside the Buffer Provision.

4. Whether Plaintiffs established likely substantial overbreadth under *Moody v. NetChoice, LLC* and *United States v. Hansen* after accounting for the RSA's actual text, available contextual constructions, and legitimate applications.

5. Whether the police notice requirement creates the standardless discretion found below.

6. Whether the constitutional defects the District Court identified require injunction against the RSA in its entirety.

## STATEMENT OF FACTS

### A. The Religious Safety Act

The Nassau County Legislature unanimously passed the RSA on December 17, 2025, and the County Executive signed it into law. The RSA became effective on January 12, 2026. (SPA-5, 7). Its stated purpose is "to protect public safety and the right to religious freedom," rights that are "threatened when demonstrators enter or remain in close proximity to those that are attempting to enter or leave places of religious worship." (SPA-6 (quoting RSA § 2 (SPA-1-3))). The RSA seeks to protect individuals' constitutional rights "to practice their religion and to safely travel to and

from religious institutions without physical obstruction, interference, intimidation, or risk of injury." (RSA § 2 (SPA-1-3); SPA-6).

The law contains two operative provisions. The Buffer Provision makes it unlawful to "demonstrate, picket, protest, distribute literature, display signs, engage in oral advocacy, or other forms of expressive or symbolic conduct, whether conducted individually or in groups, within thirty-five (35) feet of the Entrance Area or Driveway of a Place of Religious Worship." (RSA § 4(b) (SPA-1-3); SPA-6). The Bubble Provision makes it unlawful to "knowingly approach within ten (10) feet of an individual, without such individual's expressed consent," for the purpose of the same enumerated activities, "within one hundred (100) feet from the Entrance Area of any Place of Religious Worship." (RSA § 4(a) (SPA-1-3); SPA-6-7).

The operative prohibitions have express temporal and enforcement limits. Both apply from one hour before until one hour after a religious service, community meeting, ceremony, or other congregational, educational, or organizational meeting or event. (RSA §§ 4(a)–(b) (SPA-1-3); SPA-7). Before either provision applies, an individual must first have received a verbal, written, or other instruction, warning, or order from a Nassau County police officer or an authorized local police force explicitly concerning their expressive conduct. (RSA § 4 (SPA-1-3); SPA-7). Section 5 makes a violation a misdemeanor; § 4 makes the specified acts of expression unlawful only after receipt of the police communication. (RSA §§ 4–5

(SPA-1-3); SPA-7). Read together, those provisions permit punishment for prohibited conduct only after receipt of this warning, not retroactive punishment for conduct preceding it. The RSA also contains an express severability clause providing that any invalidation "shall be confined in its operation to the clause, sentence, paragraph, subdivision, section or part of this law" determined to be invalid. (RSA § 6 (SPA-1-3); SPA-60-61).

**B. The context of the RSA's enactment.**

The Legislature enacted the RSA against the backdrop of recent regional, national, and international incidents involving violence, intimidation, and disruption at or near houses of worship. The legislative sponsor explained that the law was designed to safeguard the right of Nassau residents to enter and exit places of religious worship without fear of intimidation, harassment, physical obstruction, or assault, and identified the November 19, 2025, demonstration outside Park East Synagogue in Manhattan as a precipitating event. (SPA-5). Legislators also referred to the December 2025 mass shooting at a Hanukkah celebration at Bondi Beach in Sydney, which killed at least fifteen people. (SPA-5-6). In the District Court litigation, the County submitted articles describing examples of attacks and disturbances both before and after enactment, including an August 2025 shooting during Mass at Annunciation Catholic School in Minneapolis, which killed two children; an assault on a woman outside a Brooklyn synagogue during a protest in

Crown Heights; the vandalizing of multiple Queens synagogues and Jewish homes with swastikas in May 2026; and a May 2026 incident in which more than one hundred protesters attempted to breach barricades outside Park East Synagogue, injuring two police officers. (Spolzino Decl. (A-475-477) ¶¶ 5–10 & Exs. 2–7 (A-478-523)). The County also submitted a Nassau County Police Department report documenting incidents at County houses of worship from 2021 to the present. (Todd Decl. Ex. 1 (A-531-546)). The District Court discussed those submissions but gave insufficient weight to the access-related risks they document, the preventative role of entrance and driveway rules, and the continuing need for access protection during this litigation given this surrounding context. (SPA-22-23, 31-32).

The County also identified the federal Freedom of Access to Clinic Entrances Act ("FACE Act"), which protects religious exercise from force, threats of force, and physical obstruction, and the proposed Safeguarding Access to Congregations and Religious Establishments from Disruption ("SACRED") Act, which the District Court described as addressing intentional intimidation, obstruction, or harassment near worship through specified threatening, blocking, or approach conduct. (18 U.S.C. § 248(a)(2); SPA-30). Those measures address related interests through different predicates.

### C. Plaintiffs and their planned activities.

Plaintiffs Borecky and Thiery are Nassau County residents and Catholics who wished to distribute the New York Bishops' statement entitled "For You Too Were Once Aliens" to churchgoers outside nine identified churches, converse with parishioners, and encourage them to sign the "Cabrini Pledge." Borecky cancelled a planned December 21, 2025, leafletting campaign because she believed the RSA would take effect immediately upon passage. She was mistaken. The law did not become effective until January 12, 2026. (SPA-7-9). Thiery also described plans to distribute know-your-rights leaflets and whistle packets outside storefront churches. (SPA-10). Plaintiffs described continuing plans and apprehension about enforcement after the RSA's effective date. Their claimed prospective injury is therefore distinct from the event cancellation they describe. The standing and merits consequences of those plans must be assessed independently under the RSA's actual terms.

### D. Prior proceedings.

Plaintiffs filed suit on April 7, 2026, asserting free speech and due process claims under both the federal and New York constitutions, and moved for a preliminary injunction on April 13, 2026. (SPA-15). The District Court heard arguments on May 21, 2026, and received simultaneous supplemental briefs. (*Id.*). It granted the motion on June 18, 2026, enjoining Defendants "from enforcing the

Nassau County Religious Safety Act, Local Law No. 6-2025, in its entirety until this case has been finally resolved." (SPA-66).

The District Court found the RSA content neutral and its governmental interests substantial but concluded that both provisions likely fail narrow tailoring and leave inadequate alternative channels, both as applied to Plaintiffs and facially. (SPA-19; 12; 34-36; 39-42; 54-59). Its facial analysis included a hypothetical discussion of clothing, signs, ordinary conversation, and other forms of incidental or passive expression. (SPA-49-50, 56). It rejected the County's proposed contextual constructions, treated the warning mechanism as standardless, and discussed the law's potential extension onto private property and into buildings. (SPA-44-47, 60-63). It declined severance and found the remaining preliminary injunction requirements satisfied. (SPA-61-65). The District Court incorrectly noted that Defendants had not disputed standing and declined to reach the likelihood of success on the due process claim. (SPA-63 nn.14–15). This appeal challenges every ground supporting the injunction.

## SUMMARY OF ARGUMENT

The RSA must be construed according to its operative text. The Bubble Provision requires a knowing approach for a specified expressive purpose; merely passing another person while wearing a message does not automatically satisfy that

requirement. Both provisions require receipt of a specific police communication before the prohibited conduct becomes unlawful.

This Court must independently assure itself of Article III standing. Standing "must affirmatively appear in the record," and federal courts are "under an independent obligation to examine their own jurisdiction." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230–31 (1990). The cancellation of Borecky's December 21 event, before the RSA became effective, does not establish that the law prohibited that event or supply the necessary proof of a threatened post-effective-date injury. Plaintiffs' separate prospective claims must be tested against the law's actual distance, time, conduct, consent, and receipt conditions, rather than an assumed prohibition on all speech near worship. For preliminary relief, Plaintiffs had to substantiate that jurisdictional showing with specific facts. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011).

*Vitagliano v. County of Westchester*, 71 F.4th 130, 138–40 (2d Cir. 2023) (per curiam), permits pre-enforcement standing based on concrete intended speech and a credible threat; it does not require an arrest or a personal enforcement threat. Its legal test governs here, but its application at the pleading stage does not relieve Plaintiffs of the evidentiary burden governing this preliminary injunction. Here, the District Court erroneously accepted Plaintiffs' cessation of planned activities as sufficient "alleged injury" without analyzing how the RSA's receipt condition affected the

threatened restriction or separately identifying injury from each provision. (SPA-63 n.15). That omission matters most particularly to the Bubble Provision, which regulates knowing, unconsented close approaches, not stationary distribution or all conversation near a church. The County seeks vacatur for failure to establish standing for preliminary relief and, independently, reversal and restoration of both provisions on the merits.

The District Court found the RSA content neutral and held that it serves substantial – indeed, "strong, indisputable, and significant" – government interests. (SPA-21, 23). It also correctly noted that legislatures are not required to wait for local tragedies and can act prophylactically to prevent harm. (SPA-24). But the District Court erred in its assessment of the RSA's actual burden and preventive function. The fixed zone protects entrances and driveways during congregational events; the bubble addresses purposeful, unconsented approaches in the nearby arrival area. The warning condition further limits prosecutable conduct. The County must justify restrictions on peaceful speech, but the proper comparison is between their actual operation and the protection afforded by the proposed alternatives, not between peaceful expression and violent crimes considered in isolation. The RSA applies only during limited times and at finite locations, leaving speakers free to engage in expressive conduct and speech at alternative times or locations; the requirement to receive a police warning further narrows the restrictions. In weighing

the equities, the District Court treated its merits conclusion as dispositive without adequately weighing the continuing harm to the other First Amendment right at stake: the right of worshippers to exercise their religion free of intimidation and obstruction, an interest Congress itself recognizes in 18 U.S.C. § 248(a)(2).

*Hill v. Colorado*, 530 U.S. 703, 726–31 (2000) is central to analysis of the Bubble Provision. *Vitagliano*, 71 F.4th at 140–41, confirms that *Hill* remains controlling. The District Court relied on the two-foot increase in approach distance, the fixed zone's interaction with stationary speech, and differences in the supporting record. (SPA-38-42). Those distinctions require a functional assessment of the RSA's consent exception, knowing approach, expressive purpose, event windows, and notice condition – not an assumption that *Hill* establishes a rigid numerical ceiling. Rather, *Hill* upheld a buffer extending a "normal conversational distance" and explicitly accorded the Colorado Legislature deference in determining the exact extent of this distance. 530 U.S. at 727-28 (quoting *Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 377 (1997)). The fixed zone and bubble address different access problems: congregation at entrances and driveways, and purposeful, unconsented encounters in the surrounding arrival area. Both should be sustained. If their interaction alone were excessive, that would require consideration of severance, not automatic invalidation of the independently valid Bubble Provision.

The District Court's facial holding was also incorrect. A facial challenge requires construing the law's actual reach and comparing its realistic unconstitutional applications with its legitimate sweep. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723–24 (2024); *United States v. Hansen*, 599 U.S. 762, 769–70 (2023). Facial invalidation is "strong medicine" reserved as a "last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). The error was not considering future applications; it was counting applications that the properly construed statute does not reach and treating the warning mechanism as authority to invent additional prohibitions. Before invalidating the entire enactment, the District Court was required to give effect to its context and purpose element and assess fairly available narrowing constructions. *See Frisby v. Schultz*, 487 U.S. 474, 482–83 (1988); *Boos v. Barry*, 485 U.S. 312, 329–31 (1988). It did not.

Finally, the District Court's ban on enforcing the RSA was dramatically overbroad. New York law and the RSA's express severability clause required the court to confine any remedy to the provisions or phrases "directly involved in the controversy." (RSA § 6 (SPA-1-3)). The Bubble Provision stands on its own under *Hill*. The District Court's objections to particular phrases and applications failed to account for the distinct severability analysis, rather than an assumption that every remainder would be invalid. If the facial holding is reversed or narrowed, *Trump v. CASA, Inc.* and *Picard v. Magliano* require any remaining relief to be limited to

these Plaintiffs and the conduct as to which they established injury, rather than a countywide decree nullifying the RSA in all applications. The County requests reversal of the order and vacatur of the entire preliminary injunction, leaving further proceedings on unresolved claims to the District Court.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion, the underlying legal conclusions *de novo*, and factual findings for clear error. *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36–37 (2d Cir. 2018). A decision resting on a legal error is an abuse of discretion. *Id*. Plaintiffs must establish the applicable preliminary injunction requirements; where governmental action taken in the public interest is challenged, likely success cannot be replaced by the ordinary serious questions alternative. *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631, 637 (2d Cir. 2020). Article III standing must independently appear in the record. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230–31 (1990); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

# ARGUMENT

## I

## Plaintiffs failed to establish Article III standing for preliminary relief.

### A. Plaintiffs had to prove standing on the preliminary injunction record.

Standing is "perhaps the most important" of the jurisdictional doctrines, and "federal courts are under an independent obligation to examine their own jurisdiction." *FW/PBS*, 493 U.S. at 230–31. The requirement cannot be waived nor forfeited, and this Court must address it "even if the courts below have not passed on it." *Id.* at 230; *see Steel Co.*, 523 U.S. at 94–95. The District Court stated that Defendants did not dispute standing. (SPA-63 n.15). That characterization does not relieve Plaintiffs of their burden or this Court of its duty to examine jurisdiction. The County need not recast its irreparable harm briefing as a previously litigated standing objection to obtain that review. Standing and the constitutionality of the RSA remain separate questions; the County's contention that the law validly regulates Plaintiffs' intended speech does not itself defeat standing.

The posture determines the required proof. At the preliminary injunction stage, Plaintiffs must support standing with specific facts under a burden normally no less demanding than at summary judgment. *Cacchillo*, 638 F.3d at 404; *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 119 (2d Cir. 2025) (per curiam). Their uncontroverted factual declarations must be credited, but their legal conclusions

about what conduct the RSA prohibits are not substitutes for properly construing the statute. The District Court described cessation of planned activities as sufficient "alleged injury." (SPA-63 n.15). Alleging a fear and proving an objectively credible threat under the enacted conditions are different inquiries. Plaintiffs had to establish the latter before obtaining preliminary relief.

**B. Plaintiffs did not establish a credible threat under the RSA's complete operative conditions.**

A pre-enforcement plaintiff must demonstrate an intention to engage in conduct arguably affected with a constitutional interest, that the intended conduct is arguably proscribed by the challenged law, and the existence of a credible threat of enforcement. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 162 (2014); *Vitagliano*, 71 F.4th at 136–39. Whether an enforcement threat is credible depends on the particular circumstances, including the relationship between the plaintiff's intended conduct and the statute's prohibitions. *Vitagliano*, 71 F.4th at 138–39. Prior enforcement and an express personal threat are relevant considerations, but neither is indispensable. *Id.* at 139. Additionally, "[a]n injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not 'conjectural' or 'hypothetical.''" *Cerame v. Slack*, 123 F.4th 72, 80–81 (2d Cir. 2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The County's objection is that Plaintiffs have not established the required connection between their specific intended conduct, the RSA's operative prohibitions and conditions on liability, and

a credible threat of enforcement. Plaintiffs need not first expose themselves to prosecution, but they must establish a cognizable threatened injury under the RSA as written.

The notice requirement controls that inquiry here. Section 4 makes the specified conduct unlawful only after the individual receives the statutory police instruction, warning, or order. (RSA § 4 (SPA-1-3); SPA-7). Therefore, the distance and event conditions alone do not establish that Plaintiffs' intended speech is already unlawful. The threatened injury must arise from a realistically anticipated communication requiring them to stop or alter covered speech, or from enforcement against covered conduct after receipt of police communication. The County relies on that enacted prerequisite; it does not add an unwritten refusal offense, a formal individualized warning procedure, or a guaranteed interval to comply. Nor does the County contend that Plaintiffs must already have received a warning before suing. Where they seek a preliminary injunction, however, the question is whether the evidence establishes an objectively credible prospect of the statutory communication and the resulting restriction, rather than merely assumes that liability will arise immediately from speaking within the zones.

The District Court identifies Plaintiffs' fear of arrest, their abandoned activities, and their decision not to engage in future actions while the RSA remains in effect. (SPA-9-10). But it identified no police communication received by either

Plaintiff and makes no finding explaining why receipt of such a communication is realistically threatened in connection with their intended activities. Its standing footnote instead treats cessation from fear of prosecution as sufficient alleged injury. (SPA-63 n.15). A declaration that Plaintiffs believe all such activity is forbidden does not answer the legal and factual question as to whether the RSA's actual conditions credibly threaten that activity. The County does not insist on a prosecution directed at these Plaintiffs. It asks for the specific jurisdictional showing required by *Cacchillo*. The District Court's general account of the statute's existence and Plaintiffs' apprehension did not supply that analysis.

*Vitagliano* does not make the omitted inquiry unnecessary. There, the intended sidewalk counseling squarely fell within a recently enacted bubble prohibition, and the County had not disavowed enforcement; this Court applied the presumption that the government would enforce the conduct the statute specifically prohibited. 71 F.4th at 139–40. That principle governs, but it must be applied to this statute's complete terms. Here, receipt of a police communication is a prerequisite to illegality. The District Court could not infer immediate criminal exposure from the distance and event conditions while omitting the receipt condition. And *Vitagliano* reviewed a dismissal, not the sufficiency of proof supporting this preliminary injunction. The same substantive standing test applies, but Plaintiffs

must satisfy the evidentiary burden appropriate to the relief they obtained. *Cacchillo*, 638 F.3d at 404; *Do No Harm*, 126 F.4th at 119.

The County's position does not turn on a choice between obeying an unconstitutional warning and risking arrest. A credible threat of being ordered to stop protected speech can itself supply injury even when compliance avoids prosecution. But the anticipated restriction must still be tied to Plaintiffs' concrete intended conduct and the law's actual triggering conditions. Nor does the absence of past enforcement, standing alone, defeat a credible threat under a new law. The District Court's jurisdictional error was its failure to determine whether Plaintiffs proved that threat under this conditional prohibition, rather than under the unconditional ban they feared.

**C. The mistaken December cancellation cannot supply the missing proof of prospective injury.**

Borecky cancelled the planned December 21, 2025, action because she believed the RSA would take effect immediately upon passage. (SPA-9). In reality, the RSA did not become effective until January 12, 2026. (SPA-7). The RSA therefore could not have prohibited that event. Its cancellation cannot establish that the enacted prohibition had already curtailed Plaintiffs' speech and does not by itself establish a threatened injury warranting prospective relief. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5, 416 (2013); *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).

Plaintiffs also described continuing apprehension and Thiery's separate packet distribution plans; those matters cannot be disregarded. (SPA-9-10). But they must instead establish prospective injury on their own terms. The District Court's reliance on the pre-effective-date cancellation as evidence of a present chilling effect (SPA-63) cannot substitute for analyzing whether the post-effective-date plans are arguably proscribed and credibly threatened under the complete statute.

**D. Standing to challenge the Bubble Provision cannot simply be borrowed from the fixed buffer.**

Standing must be shown for each claim and each form of relief. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352–53 (2006); *Cacchillo*, 638 F.3d at 404. The two RSA provisions create independently operative restrictions with different predicates. Plaintiffs' plans to stand on sidewalks at church access points and distribute literature implicate the fixed buffer. Those plans do not automatically establish an injury from the bubble, which requires a knowing approach within ten feet, without the individual's expressed consent, for an enumerated expressive purpose. (RSA § 4(a) (SPA-1-3); SPA-6-7). Plaintiffs planned to approach parishioners and engage willing listeners. (SPA-8-9). The inquiry is whether their evidence establishes intended approaches arguably within the bubble's distinct prohibition and a credible threat under its receipt condition; the mere location of a speaker within 100 feet is insufficient. A listener's willingness is not automatically expressed consent, but neither may every intended conversation or distribution be

treated as an unconsented close approach. The District Court's general standing footnote supplies no separate analysis of those predicates. (SPA-63 n.15). If this Court finds standing as to the buffer, it must still determine whether Plaintiffs established injury from the independently challenged bubble.

The facial theory does not erase that requirement. Overbreadth relaxes the restriction on representing third parties' interests; it does not supply an Article III injury where none is present or imminently threatened. *Hedges v. Obama*, 724 F.3d 170, 204 (2d Cir. 2013). Hypothetical enforcement against a passerby wearing a message, or against persons engaging in other incidental expression, cannot by itself establish these Plaintiffs' standing. They must first demonstrate their own cognizable injury from the challenged restriction. Their proposed constitutional arguments may then extend beyond their own speech within the limits of overbreadth doctrine.

The District Court erroneously treated fear of an assumed categorical ban as sufficient without determining whether their evidence showed a credible threat under the RSA's complete operative terms. That threshold failure requires that the injunction be vacated; it is not another way of resolving the RSA's constitutionality. At minimum, the injunction against both provisions cannot stand without the required analysis of injury from each independently operative restriction. If further factual determination is necessary, this Court should remand for that determination

under *Cacchillo*, rather than permit an injunction against the entire law to rest on the footnote's acceptance of alleged injury.

## II

## The District Court's analysis of the merits rests on legal errors that independently require reversal.

### A. The District Court found that the RSA is content neutral and serves a substantial government interest.

Two foundational conclusions of the District Court are common ground and frame this appeal. *First*, the RSA is content neutral. The District Court held – and Plaintiffs agreed – that the law "places no restrictions on . . . either a particular viewpoint or any subject matter," does not require enforcement authorities to examine the content of any message, and turns "not on what [speakers] say, but simply on where they say it." (SPA-19 (quoting *Hill*, 530 U.S. at 723, and *McCullen v. Coakley*, 573 U.S. 464, 479 (2014))). *Second*, the RSA serves substantial government interests. The District Court described the County's interest in "protecting those who wish to exercise their religious liberty from harassment or violence" as "strong, indisputable, and significant," and it expressly "conclude[d] that Defendants have established the RSA promotes a substantial government interest." (SPA-21, 23). It further acknowledged, citing *Burson*, that "[l]egislatures are not required to wait for a local tragedy to act before preventing foreseeable harm." (SPA-24).

Under *Ward v. Rock Against Racism*, 491 U.S. 781, 798–800 (1989), those two conclusions should have set the terms of the governing inquiry: a content neutral regulation is narrowly tailored "so long as [it] promotes a substantial government interest that would be achieved less effectively absent the regulation," and it "need not be the least restrictive or least intrusive means" of serving that interest. *Id.* at 798–99. *Ward* also prohibits burdening substantially more speech than necessary. *Id.* at 799–800. The County's position meets that standard: the law protects specified access points during event periods and limits the surrounding no-approach rule by consent, knowledge, purpose, and notice. The District Court cited *Ward* but undervalued those limits and the access function they serve. Each of the analytical moves by which the District Court traveled from its premises (content neutrality; substantial interest) to its conclusion (likely facial and as-applied invalidity of the entire law) constitutes an error of law.

**B. The District Court understated the County's interest, which includes protecting the First Amendment rights of worshippers.**

The RSA protects the exercise of an enumerated constitutional right: the free exercise of religion. The District Court itself described that guarantee as "at the heart of the First Amendment." (SPA-21). *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19–20 (2020) (per curiam), underscores the concrete harm when worshippers cannot attend services. Congress has recognized the same interest in the FACE Act, which protects persons exercising religious freedom at a place of

worship from force, threats of force, and physical obstruction. 18 U.S.C. § 248(a)(2). Where a spatial regulation protects citizens engaged in the exercise of another fundamental right at the moment they are most vulnerable, the Supreme Court has sustained far more restrictive measures. *Burson v. Freeman*, 504 U.S. 191, 206–11 (1992) (plurality opinion), upheld a 100-foot campaign-free zone around polling place entrances based on the historical need to protect voting from intimidation and fraud. Its instructive principle is that protecting access to another constitutional activity can justify a prophylactic spatial rule; the County relies on the RSA's own operation and record to justify its particular distances. And *Grayned v. City of Rockford* establishes that the nature of a place and the pattern of its normal activities inform what time, place, and manner regulation is reasonable, 408 U.S. 104, 116 (1972), a principle that requires full weight here at service times, when congregants (including children and the elderly) must funnel through fixed entrances and driveways.

The District Court's treatment of these interests was asymmetric. It measured the RSA's burdens with a microscope, crediting speculative applications to t-shirts, buttons, and small talk (SPA-49-50) while measuring the County's interest with a thumb on the scale, discounting the record's relevance to a general access rule because it did not establish that these Plaintiffs' particular leafletting would become violent. (SPA-22-23, 32). The First Amendment does not mandate that inversion.

Worshippers' rights to assemble for religious exercise, and the County's duty to protect that right against a documented national and regional surge of violence and intimidation at houses of worship, deserve full constitutional weight in both the tailoring analysis and the equities. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650–52 (1981); *Frisby v. Schultz*, 487 U.S. 474, 484–85 (1988) (upholding a narrowed prohibition on focused residential picketing to protect the captive audience in a home).

**C. The District Court gave inadequate weight to the record's access related risks and the County's preventive judgment.**

Having recognized that the County's interests are substantial and that legislatures need not await local tragedy, the District Court nevertheless erroneously discounted the record as "sparse" and found no adequate link to the restriction imposed. (SPA-22-23, 29-32). The District Court expressly disclaimed a requirement of a "hyper-localized" record. (SPA-31). The County challenges the District Court's assessment of relevance and fit, not that disclaimer. The Park East demonstrations bear directly on the concentration of demonstrators at religious access points; the District Court's focus on whether these Plaintiffs' own peaceful advocacy had escalated into violence overlooks how a generally applicable access rule works. *Marcavage v. City of New York*, 689 F.3d 98, 106–07 (2d Cir. 2012), rejected assessing a congestion and security rule solely by the risk posed by the two

plaintiffs seeking an exemption. The relevant question is the effect of the covered activity generally at the regulated places and times.

*First*, evidence from other jurisdictions may inform that assessment. *City of Renton v. Playtime Theatres*, *Inc*., 475 U.S. 41, 51–52 (1986), permits reliance on other cities' evidence reasonably believed relevant, without requiring a new local study. Although *Renton* involved adult theater zoning, its evidentiary principle reinforces the District Court's own recognition that Nassau need not await a local tragedy. More directly, *Marcavage* recognized the legitimate role of preventive security planning in regulating public sidewalk demonstrations. 689 F.3d at 105–07. The County's articles do not all establish the same risk: mass shootings and vandalism show the broader safety context, while demonstrations at religious entrances speak more directly to the need for access controls. The latter evidence should be evaluated for its relevance to keeping entrance and driveway areas usable during congregational events, rather than dismissed because these Plaintiffs propose peaceful speech.

*Second*, "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 391 (2000) (addressing campaign contribution limits). There is nothing novel or implausible about the proposition that demonstrators massed at the

doors and driveways of a synagogue, church, or mosque at service time can intimidate worshippers and obstruct access; recent events supply grim confirmation. That context-sensitive evidentiary principle is a useful analogy, not a substitute for *Ward*'s fit requirement. Here the fit lies in concentrating restrictions at access points and during the periods of congregational arrival and departure. *Burson*'s historical analysis likewise supports preventive protection of constitutional activity. 504 U.S. at 208–11 (plurality opinion). Indeed, the statute upheld in *Hill* was a statewide, prophylactic enactment; the Supreme Court expressly rejected the argument that protection must be confined to facilities with prior obstruction incidents. 530 U.S. at 730–31.

*Third*, the brevity of the Legislature's debate is not itself a constitutional defect. The District Court noted a "five minute discussion," the absence of committee findings, and the lack of local congregant testimony. (SPA-22). The First Amendment imposes no minimum hearing requirement. *Ward* and *McCullen* test the enacted restriction and its justification, not the number of minutes spent debating it. The County must substantiate fit, but a court should not mistake the absence of formal findings for the absence of a relevant safety problem or require documented injury at every entrance before preventive regulation is possible. The District Court's own recognition that legislatures may act before local tragedy confirms the point. (SPA-24).

**D. The District Court undervalued the RSA's preventive access function when assessing narrower alternatives.**

The centerpiece of the District Court's narrow tailoring holding was that the County "could have drafted a law that criminalized" harassment, intimidation, and obstruction directly on the model of the FACE Act or the proposed SACRED Act rather than restricting activity within a defined fixed zone. (SPA-29-31). *McCullen* requires the County to explain why substantially less burdensome alternatives would not adequately achieve its interests. 573 U.S. at 494–97. But under *Ward*, a content neutral regulation "need not be the least restrictive or least intrusive means" of serving the government's interests; that requirement is the hallmark of strict scrutiny, not intermediate scrutiny. 491 U.S. at 798–99. The District Court's error was treating intent-based conduct prohibitions as equivalent substitutes without adequately accounting for the different protection provided by keeping the immediate access area clear before obstruction or an intimidating encounter occurs. The question is effectiveness of protecting access, not whether the County could imagine a statute with fewer words or a narrower list of offenses.

The alternatives the District Court identified do not show, by themselves, that the RSA fails intermediate scrutiny. Intent-based statutes such as the FACE Act operate differently from prophylactic access zone rules and may not address real-time access problems at fixed entrances and driveways. *Madsen v. Women's Health Center, Inc.* illustrates why such tools may fail: where the governmental interest is

in *preventing* harm at a physical chokepoint in real time, prophylactic distance requirements do work that after-the-fact prosecution cannot. 512 U.S. 753, 769–70 (1994) (sustaining a 36-foot entrance and driveway buffer after a prior injunction failed to protect access). *Schenck v. Pro-Choice Network of Western New York* likewise sustained fixed buffer zones "around the doorways, driveways, and driveway entrances" as necessary to secure access. 519 U.S. 357, 380–81 (1997). Those decisions establish that direct bans on misconduct and preventive spatial rules perform different work; they do not create a numerical safe harbor. *Marcavage* likewise upheld a temporary no-demonstration zone despite proposed alternatives allowing people to keep walking or stand to one side. 689 F.3d at 106–07. The RSA's 35-foot distance must be assessed with its event and receipt conditions and the access risks in this record, rather than treated as unnecessary simply because another law punishes completed obstruction.

*McCullen* does not make 35 feet unconstitutional *per se*. It invalidated Massachusetts's exclusion rule because of its substantial burden on personal conversations and leafletting and the Commonwealth's failure to show why available, less intrusive measures were inadequate. 573 U.S. at 490–97. The RSA differs in material ways: it restricts specified activities rather than entry or presence as such, applies during defined congregational event windows, contains no categorical speaker exemptions, and requires receipt of a police communication

before a violation. Those features must be assessed together. Massachusetts's post-*McCullen* withdrawal order statute illustrates the use of a notice condition, but it also requires substantial impediment of access, a written order, marked boundaries, and a limited duration. Mass. Gen. Laws ch. 266, § 120E½(b). The County relies on the RSA's own limits and preventive function; it does not claim that *McCullen* approved every warning-based scheme. As *Hill* explains, a bright line approach restriction can protect against unwanted confrontations without requiring officers to wait until a separately punishable assault or breach of the peace occurs. 530 U.S. at 729.

The warning requirement materially reduces the risk of punishing conduct before notice. Section 4 makes receipt of the statutory communication a condition of illegality, and its "instruction, warning, or order" language should be read in relation to the statutory prohibition communicated – not as an officer's power to invent a new offense. The misdemeanor applies to specified conduct only after that receipt condition is satisfied. But receipt and mental culpability are distinct requirements; the notice condition alone does not establish the mental state required for the conduct or the distance and timing elements. The District Court's categorical strict liability premise gives insufficient weight to New York's rule that a crime should require mental culpability unless the Legislature clearly indicates otherwise. N.Y. Penal Law § 15.15(2). The federal interpretive presumption points in the same direction. *Staples v. United States*, 511 U.S. 600, 619 (1994); *Morissette v. United*

*States*, 342 U.S. 246, 250–52 (1952). The provision should therefore be construed to require awareness of the operative facts necessary to the offense, rather than accidental liability from an unknowing crossing of a distance or event boundary. That construction does not require proof of hostility to religion or knowledge that the conduct is unlawful.

**E. The RSA leaves ample alternative channels, and the District Court overstated its burden on Plaintiffs' speech.**

A time, place, and manner regulation need not preserve a speaker's *preferred* channel; it must leave "ample alternative channels for communication." *Ward*, 491 U.S. at 791, 802; *see Heffron*, 452 U.S. at 654–55. This Court has sustained substantial restrictions on a speaker's chosen location where the record justified them and meaningful alternatives remained. *See Marcavage v. City of New York*, 689 F.3d 98, 104–07 (2d Cir. 2012) (upholding exclusion of demonstrators from the sidewalks nearest Madison Square Garden during the Republican National Convention, where a demonstration zone and other locations remained available); *N.Y. ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 202–03 (2d Cir. 2001) (recognizing valid fixed entrance buffers while rejecting unjustified enlargements).

Plaintiffs retain direct channels for communication. Outside event windows, the RSA does not restrict their leafletting or conversation. During event windows, they may speak, leaflet, and display signs outside the fixed access zones; in the surrounding bubble area they may remain stationary and communicate with passing

listeners, and they may approach a consenting listener. *Hill*, 530 U.S. at 729–30. The relevant separation is measured from an entrance or driveway, not a 35-foot distance from every worshipper outside the fixed zone.

The District Court's contrary discussion of "solicitation from 35 feet away" conflates those distances. (SPA-35). The maps show that several regulated zones reach public sidewalks; they do not make every churchgoer throughout the approach route unreachable. (SPA-11-12, 27-28). The overlapping event calendars likewise bear on practical availability, but the temporal trigger remains congregational use of the access points, including community and educational events, rather than a round-the-clock restriction. (SPA-13-14, 48). The alternatives inquiry must examine whether locations outside the mapped fixed zones permit direct contact with congregants along their arrival and departure routes during the relevant event periods. The fact that speech is permitted somewhere else or at another time is not itself the answer.

The District Court's radius-based conclusion must be tested against the actual routes and opportunities for face-to-face contact that remain. The County relies principally on those direct opportunities, not on an assumption that parish bulletins or clergy outreach must succeed despite the contrary evidence below. (SPA-36). *Ward*, 491 U.S. at 802, and *Marcavage*, 689 F.3d at 107–08, require ample channels,

not the speaker's optimal position. *Hill*'s stationary and consent mechanisms are particularly important to that assessment.

**F. The bubble provision is constitutional under *Hill*, which remains binding.**

The Bubble Provision closely tracks the core no-approach mechanism upheld in *Hill*: a 100-foot regulated zone around a sensitive facility entrance; a prohibition on knowingly approaching within a short "normal conversational" distance of another person without consent; defined communicative purposes; no restriction on stationary speakers; and continued freedom to speak, display signs, and engage expressly consenting listeners. 530 U.S. at 707–08, 726–27. *Hill* has never been overruled. This Court held as much in *Vitagliano*, affirming dismissal of a challenge to Westchester's materially similar bubble zone law because "*Hill* remains controlling precedent." 71 F.4th at 141. The Seventh Circuit has held the same. *Price v. City of Chicago*, 915 F.3d 1107, 1119 (7th Cir. 2019) (*Hill* "remains binding" on lower courts notwithstanding tension with later cases), *cert. denied*, No. 18-1516 (U.S. July 2, 2020). A nonprecedential Third Circuit decision also upheld an eight-foot fixed entrance buffer on its record; certiorari was denied in February 2025. *Turco v. City of Englewood*, No. 22-2647, 2024 WL 361315, at *3 (3d Cir. Jan. 31, 2024) (nonprecedential), *cert. denied*, 145 S. Ct. 1222 (2025). The controlling support is *Hill* and *Vitagliano*; the certiorari denials are procedural history, not merits endorsements.

The District Court's distinctions do not justify its result. *First*, the additional two feet must be evaluated by the operation of the no-approach rule, not treated as a constitutional ceiling. (SPA-37-38). Neither *Hill* nor *Vitagliano* holds that eight feet is the maximum permissible distance. In fact, the Court in *Hill* expressly upheld the "normal conversational" distance and stated that the legislature should be accorded deference in determining what no-approach distance constituted "the best possible accommodation of the competing interests at stake." 530 U.S. at 727-28. *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 404–08 (6th Cir. 2022), involved a *fixed* ten-foot no-entry zone covering healthcare facilities throughout the county, despite access problems documented at one clinic. It did not decide the validity of a consent-based ten-foot approach rule that preserves stationary speech – if the goal is to protect First Amendment rights within a "conversational" radius, there is no material difference between eight feet and ten feet.

*Second*, the District Court relied on the fixed zone's effect on stationary leafletting and on differences in the evidentiary record. (SPA-38-42). The County's evidence and preventive justification are addressed above; *Hill* does not require a local incident at every regulated entrance. 530 U.S. at 730–31. The two RSA mechanisms also do distinct work: the fixed zone protects entrance and driveway circulation, while the bubble restrains purposeful, unconsented close approaches

farther along the arrival path. Consent and stationary speech preserve communication in that surrounding area.

*Third*, the facial analysis treated knowing movement while wearing a message as sufficient, without separately applying the requirement that the approach be made "for the purpose of" the specified expression. (RSA § 4(a) (SPA-1-3); SPA-56). Incidental passage by a person wearing a message does not, without more, establish that purpose. *Hill* also regulated oral "education" and "counseling," not only confrontational protest. 530 U.S. at 707, 721–23. The RSA's phrase "oral advocacy" should likewise be read as purposeful communication, not every casual conversation. Finally, the independent discretion objection turns on the statute's substantive boundaries and the meaning of its receipt condition; Point III.D answers it directly. These distinctions support applying *Hill*'s functional reasoning to sustain the Bubble Provision. If the Court nonetheless finds the combined burden excessive, it must assess the bubble independently after removal of the fixed zone interaction. *See infra* Point IV.

## III

## Facial invalidity was error under *Moody* and *Hansen*.

### A. Facial invalidation is an extreme remedy reserved for laws whose unconstitutional applications substantially outweigh their legitimate sweep.

Facial invalidation on overbreadth grounds is "strong medicine" to be employed "sparingly and only as a last resort." *Broadrick*, 413 U.S. at 613. A court may strike down a law in its entirety only if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," *Moody*, 603 U.S. at 723 (quotation omitted), and only where the "law's unconstitutional applications [are] realistic, not fanciful, and their number . . . substantially disproportionate to the statute's lawful sweep," *Hansen*, 599 U.S. at 770. The overbreadth "must not only be real, but substantial as well," *Broadrick*, 413 U.S. at 615. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449–50 & n.6 (2008), cautions against speculation beyond a statute's requirements while expressly recognizing First Amendment overbreadth review; *see Virginia v. Hicks*, 539 U.S. 113, 118–20 (2003); *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988). There must be "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).

**B. The District Court's imagined applications disregard statutory limits.**

The District Court recognized the predictive nature of facial analysis: it acknowledged that, to compare the RSA's constitutional and unconstitutional applications, "the Court has to engage in some amount of surmise and speculation." (SPA-49). The error lies in the applications it counted under its expansive statutory construction. The District Court posited prosecutions for "wearing any t-shirt, hat, or button with any message"; for "standing in silence, sitting, singing, or even playing music at a low volume"; for "advertising a business"; for "the most basic conversation where two individuals have (even slightly) differing views about any subject . . . or even where to go to eat after services or whose car to drive to that lunch." (SPA-49-50). Those examples depend on treating every incidental message as covered activity and, for the bubble, disregarding the expressive purpose element. The absence of completed prosecutions does not foreclose facial review; the governing question is whether the examples are realistic applications of the law properly construed. *Hansen*, 599 U.S. at 770. A court must construe the statute before measuring its overbreadth. *United States v. Williams*, 553 U.S. 285, 293 (2008). The District Court's refusal to give the listed activities and purpose requirement their contextual force expanded the numerator before the comparison began.

That reading is also implausible on the statute's own terms. A prosecution of incidental expression under it would require a Nassau County police officer, during an event window, to (1) conclude that merely wearing an expressive t-shirt or discussing lunch plans constitute "demonstrat[ing], picket[ing], protest[ing] . . . or other forms of expressive or symbolic conduct" within the meaning of a law entitled the "Religious Safety Act" and expressly directed at protecting access to worship; (2) communicate an instruction, warning, or order that the individual actually receives; and (3) establish prohibited conduct after receipt. For the Bubble Provision, the prosecution must additionally establish that the knowing, unconsented approach was made for a covered expressive purpose. An ordinary approach while wearing a crucifix or band t-shirt does not itself prove that element. Overbreadth doctrine requires a "realistic danger," *Taxpayers for Vincent*, 466 U.S. at 801, not a judicial thought experiment about the most aggressive imaginable enforcement of an overextended reading of a statute, particularly a reading the County itself disavowed on the record. (SPA-44-45; A-642).

**C. The District Court refused narrowing constructions that precedent required it to consider.**

Before facially invalidating a state or local enactment, a federal court "must consider any limiting construction that a state court or enforcement agency has proffered," *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982), and must construe the law, where fairly possible, to avoid

constitutional infirmity. The Supreme Court has saved spatial and picketing regulations by fairly available narrowing constructions. In *Frisby*, the Court *rejected* the lower courts' broad reading of a residential picketing ban as "plain error," adopted a narrowing construction limiting the ordinance to focused picketing of a single residence, and upheld the law, explaining that ambiguous enactments are "interpreted to avoid constitutional difficulties." 487 U.S. at 482–83. In *Boos v. Barry*, the Court accepted a narrowing construction of a congregation-dispersal provision and upheld it. 485 U.S. at 329–31. The obligation here is to consider a construction grounded in the actual text, not to accept any limitation counsel proposes. The County's proposed reading meets that requirement for the following reasons.

*First*, the residual phrase "or other forms of expressive or symbolic conduct" should be read with the six activities that precede it. The District Court treated the phrase as unambiguous because expressive conduct is a First Amendment term of art and found no common class among the listed activities. (SPA-45-47). *Eisenhauer v. Culinary Institute of America*, 84 F.4th 507, 521–22 (2d Cir. 2023), however, requires genuine uncertainty and an identifiable class before *ejusdem generis* can narrow a catchall. Both are present here: the question is not what expression receives constitutional protection, but which "other forms" of conduct this particular enumeration prohibits. The listed demonstrations, pickets, protests, literature

distribution, sign displays, and oral advocacy share a communicative function – deliberately presenting a message to others at the regulated place. The catchall captures comparable methods, such as a silent vigil or a coordinated symbolic performance, without automatically reaching an incidental emblem on a passerby or every conversation between friends. That reading gives the catchall independent work rather than making it surplusage. *See Yates v. United States*, 574 U.S. 528, 545–46 (2015) (plurality opinion); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001). The statute's title, heading, and stated concern with demonstrators reinforce that contextual reading. (RSA §§ 2, 4 (SPA-1-3)). It does not impose an "organized" or group-only requirement – the law expressly reaches individuals – and it does not exempt the literature distribution the text expressly names. "Oral advocacy" likewise means advocating a cause or proposal, rather than every casual exchange of views. This construction preserves the enacted categories while avoiding the District Court's unsupported equation of a criminal access rule with a ban on every expressive act.

*Second*, the District Court gave insufficient weight to the warning requirement and ordinary scienter principles. The Buffer Provision does not expressly impose strict liability, and New York's culpability presumption applies to crimes defined outside the Penal Law as well. N.Y. Penal Law § 15.15(2). The receipt condition further prevents criminal liability before the specified communication has been

received. Those features materially reduce the risk of accidental violation and support a narrowing construction rather than facial invalidation.

*Third*, unsettled statutory meaning should be resolved before the broadest construction is used to suspend the entire law. This Court recently applied that approach in *Volokh v. James*, 148 F.4th 71, 95–100 (2d Cir. 2025), certifying potentially dispositive New York law questions in a First Amendment injunction appeal. New York's Court of Appeals has since supplied the requested constructions. *Volokh v. James*, 2026 N.Y. Slip Op. 03913 (N.Y. June 23, 2026). The County asks this Court to adopt the RSA's fairly available contextual reading; if an authoritative state law answer is indispensable, certification is a concrete alternative to perpetuating an injunction premised on the broadest disputed reading. Where fairly possible constructions would eliminate the asserted overbreadth, the "strong medicine" of facial invalidation is unavailable. *Broadrick*, 413 U.S. at 613.

**D. The District Court's conclusion that the RSA gives enforcing officers "unbridled discretion" is unsustainable.**

The District Court separately held the RSA facially infirm because the receipt requirement gives officers "unbridled discretion." (SPA-57-59). That holding rests on the same overextended construction of the substantive prohibitions. The RSA does not authorize an officer to invent a speech restriction: the Legislature fixes the regulated distances, places, event windows, conduct, and, for the bubble, knowing approach, purpose, and consent. Receipt is a prerequisite to liability for violating

those rules. *Ward* sustained administrative discretion bounded by the regulation's terms and its narrowing construction. 491 U.S. at 794–96. *Cox v. Louisiana* recognized that "appropriate, limited discretion" is permissible under properly drawn rules and nondiscriminatory administration. 379 U.S. 536, 558 (1965); see *Cox v. New Hampshire*, 312 U.S. 569, 576 (1941). The companion *Cox* decision sustained the facial validity of a courthouse-picketing prohibition despite the need to assess proximity, while reversing the conviction after officials had authorized the location. *Cox v. Louisiana*, 379 U.S. 559, 562–65, 568–72 (1965). The question is whether the RSA supplies governing limits, not whether officers exercise judgment at all.

The cases on which the District Court relied do not dispense with that inquiry. *Long Island Vietnam Moratorium Committee v. Cahn*, 437 F.2d 344, 350 (2d Cir. 1970), involved an overbroad prohibition on flag emblems that left officials to decide which expression to tolerate. Here the statute regulates time, location, and manner without regard to message; the County's contextual construction answers the incidental emblem premise. *Reporters Committee for Freedom of the Press v. Rokita*, 147 F.4th 720, 730–31 (7th Cir. 2025), held that notice did not cure a law allowing any on duty officer to bar an approach for any reason. The RSA's rule is tied instead to designated religious access areas, actual event periods, and specified conduct. The County does not contend that a warning immunizes an otherwise

standardless law. It contends that the District Court mistook a notice prerequisite to a legislatively defined offense for authority to create the offense at will.

Whether a person has validly received notice from an officer necessitates context. A gesture must clearly communicate an instruction, warning, or order to an individual, narrowing the risk of misunderstanding a simple gesture to be a criminal trigger. (RSA § 4 (SPA-1-3); SPA-58). Read as meaningful notice of the applicable statutory boundary, the condition protects against punishment preceding that communication. That is a construction of the words enacted, not an unwritten licensing system. The District Court should have assessed the statute with that construction before invalidating both provisions facially.

**E. The RSA's plainly legitimate sweep defeats facial invalidation.**

Finally, the *Moody* comparison was lopsided because the District Court inflated one side of the ledger and confined the other to already unprotected speech and physical obstruction. (SPA-54, 56). The RSA's legitimate sweep is broader: a valid content neutral access rule can regulate protected demonstration activity at a confined entrance without requiring proof that each participant has already obstructed it. *Heffron*, 452 U.S. at 651–54; *Marcavage*, 689 F.3d at 106–07. *Hill* likewise upheld a modest, purposeful approach rule covering peaceful speakers as well as confrontational ones. 530 U.S. at 729–31. Obstructive picketing is independently regulable, *Cameron v. Johnson*, 390 U.S. 611, 616–17 (1968), but it

is not the only constitutional application of a properly tailored access law. Under the contextual reading explained above, incidental expression drops out of the District Court's overbreadth tally; under § 4(a), an approach must additionally be knowing, unconsented, and made for the covered expressive purpose. The District Court had to evaluate those actual applications and the access protection applications together. *Moody*, 603 U.S. at 723–26. Its comparison does not establish realistic unconstitutional applications substantially disproportionate to the RSA's lawful sweep. *Hansen*, 599 U.S. at 770. The facial holding should be reversed.

The District Court's private property discussion does not supply the missing analysis. The District Court expressly stated that the parties had not meaningfully litigated that issue and that it was unnecessary to the injunction. (SPA-59-60). The County does not dispute that the RSA lacks *Hill*'s express public way limitation. But possible applications inside worship buildings or on neighboring private premises require their own construction and constitutional assessment; they are not a reason to presume that every public access application is invalid. If a particular private space application proves unconstitutional, § 6 expressly permits relief confined to that circumstance. This Court should reverse the grounds actually supporting the injunction and address any necessary application-specific relief without suspending independently valid access rules.

## IV

## Any residual defect requires a separate severability analysis, not automatic suspension of the entire RSA

### A. New York law and the express clause require preservation of a valid, independently operative remainder.

"Severability is of course a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam). Under New York law, the question is "whether the legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether." *CWM Chem. Servs., L.L.C. v. Roth*, 6 N.Y.3d 410, 423 (2006) (quoting *People ex rel. Alpha Portland Cement Co. v. Knapp*, 230 N.Y. 48, 60 (1920) (Cardozo, J.)); *see Matter of Westinghouse Elec. Corp. v. Tully*, 63 N.Y.2d 191, 196–200 (1984). The Legislature's express clause supplies strong evidence that it preferred a valid remainder to no access protection at all. RSA § 6 directs that invalidity not affect the remainder and that relief be confined to the invalid part or its application to the person or circumstance directly involved. (SPA-1-3; SPA-61). A severability clause "leaves no doubt about what the enacting [legislature] wanted if one provision of the law were later declared unconstitutional." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 624 (2020) (plurality opinion). And the Supreme Court's remedial principles run in the same direction: courts must "try not to nullify more of a legislature's work than is necessary," because the "normal rule" is "partial, rather

than facial, invalidation." *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329–30 (2006) (quotations omitted). The remainder must be constitutional, operative, and consistent with legislative intent; the clause calls for that analysis rather than making validity automatic. *See Volokh*, 148 F.4th at 82–84 & n.5 (separability is functional, with independently operative commands tending to be severable).

**B. The Bubble Provision stands on its own.**

The District Court reasoned that severance was unavailable because "the constitutional defects pervade both the Buffer and Bubble Provisions." (SPA-61-62). That conclusion depends on its flawed construction and merits analysis. As Point II.F shows, the Bubble Provision's consent, knowledge, and purpose elements support its independent validity under *Hill* and *Vitagliano*. Removal of the fixed-zone interaction also restores stationary leafletting at entrances – the central structural concern identified below. (SPA-38-40). The remaining distance, purpose, record, and discretion issues must then be decided on their own terms, rather than carried forward as consequences of a provision no longer operating. The two provisions address distinct problems through distinct mechanisms, and each is "fully operative as a law" without the other. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (quotation omitted). *Leavitt* likewise rejects inferring that an independently operative provision must fail merely because the Legislature

originally enacted two provisions together. 518 U.S. at 140–44. *Brown v. City* of *Pittsburgh*, 586 F.3d 263, 276, 281–89 (3d Cir. 2009), illustrates the remedial distinction: the combined burden can be invalid even where an individual mechanism may remain. *Brown* predates *McCullen*; the County relies on it for that structural point, not as a substitute for current tailoring analysis. Both RSA provisions should be restored. If this Court concludes otherwise as to the Buffer Provision, it should vacate the injunction against the independently valid bubble, or remand for its separate assessment with the interaction removed.

**C. Objections to discrete text and applications require a focused remedial analysis.**

Even as to the Buffer Provision, the District Court had to distinguish its objections to particular text or applications from defects that would survive every proposed severance. The District Court's overbreadth analysis rested principally on two phrases: "or other forms of expressive or symbolic conduct" and "engag[ing] in oral advocacy." (SPA-43-50). Striking those phrases – as RSA § 6 expressly contemplates for any invalid "clause" – leaves a prohibition on "demonstrat[ing], picket[ing], protest[ing], distribut[ing] literature, [and] display[ing] signs" within 35 feet of entrances and driveways during the defined event windows, after receipt of the specified police communication. (SPA-1-3). A focused picketing and demonstration restriction of that scope tracks what *Madsen* upheld – a 36-foot ban on "congregating, picketing, patrolling [and] demonstrating," activities that

discouraged potential patients from entering clinics, at clinic entrances and driveways, 512 U.S. at 759; 768–70 – and the fixed entrance buffers recognized in *Operation Rescue National*, 273 F.3d at 202–10, which also rejected unjustified enlargements. To the extent the District Court believed the event window language swept too broadly by reaching non-religious community or organizational events, that concern at most warranted targeted preliminary relief against those applications, not suspension of the RSA in every circumstance.

The District Court called the proposed exercise "legislative redrafting." (SPA-62). Deleting enacted clauses or limiting unconstitutional applications is different from adding a new harassment offense or inventing a new radius. *Ayotte*, 546 U.S. at 329–30. Deletion of these phrases alone would leave the express ban on literature distribution and sign display, so the County's tailoring argument – not the deletion itself – must establish that remainder's validity. The District Court should have decided that question rather than assume that an operative narrowed text is necessarily unconstitutional. Any surviving timing, location, or notice defect likewise requires its own analysis; the County does not ask this Court to insert an unwritten exception. What the District Court did instead was to nullify an entire law, including applications it acknowledged were constitutional (SPA-54). That impermissibly "frustrates the intent of the elected representatives of the people." *Ayotte*, 546 U.S. at 329 (quotation omitted).

The preliminary posture requires the same attention to the likely validity of a remainder. The District Court itself recognized that severability could bear on whether Plaintiffs would ultimately prevail. (SPA-62 n.13). If a provision or application is independently valid and severable, suspending it is unnecessary to protect against the defect actually shown. The County seeks full reversal; any fallback relief should identify the unconstitutional provision or circumstance and leave the independently valid remainder operative.

## V

## The County-wide injunction against the RSA is overbroad and the equities do not support it.

### A. Any relief must be tailored to Plaintiffs and their conduct.

If the facial holding is reversed or narrowed, the countywide decree cannot remain merely because Plaintiffs prevailed on an as-applied claim. *Trump v. CASA, Inc.*, 606 U.S. 831, 852–55 (2025), holds that the equitable authority Congress granted federal courts does not permit relief broader than necessary to afford complete relief to the plaintiffs. The decision expressly reserved the Article III question. *Id.* at 841 n.4. The District Court distinguished *CASA* as addressing nationwide relief. (SPA-65). But the operative concern is relief against nonparties, not the number of counties on the map. *Rokita* applied *CASA* to a state buffer law and remanded the scope of an injunction for reconsideration. 147 F.4th at 732–33.

This Court likewise vacated an injunction against every enforcement of a courthouse speech statute and directed relief confined to the conduct presented. *Picard v. Magliano*, 42 F.4th 89, 106–07 (2d Cir. 2022). *Picard* distinguished a properly established substantial overbreadth claim; the County therefore first challenges the facial holding under *Moody* and *Hansen*. *Welty v. Dunaway*, No. 25-5738, 2026 WL 2874671, at *20-24 (6th Cir. Sept. 24, 2026), recently upheld broader relief after a successful First Amendment overbreadth challenge. That reasoning does not preserve this decree if its predicate facial holding fails. Plaintiffs are two individuals seeking leafletting, conversation, and packet distribution at identified churches. Relief against enforcement as to the specific activities proved unconstitutional can fully protect them without suspending independently valid applications to everyone. The District Court's erroneous facial analysis cannot be used to evade the narrower remedy required once that analysis is corrected.

**B. The balance of equities and the public interest favor the County.**

Finally, the District Court's equities analysis depended on the merits errors challenged above. (SPA-64). But the equities have independent content here. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J.,

in chambers)). The injunction deprives Nassau County's many houses of worship and their congregants of the RSA's prophylactic protection during the pendency of this litigation and during a period in which, on this record, synagogues in the region were vandalized with swastikas and a crowd attempted to breach police barricades outside Park East Synagogue, all within weeks of the decision below. (Spolzino Decl. (A-475-477) ¶¶ 9–10 & Exs. 6–7 (A-512-523)). Plaintiffs assert a prospective speech burden, which must be taken seriously, but the County disputes the District Court's conclusion that the properly construed RSA unconstitutionally imposes it. Their leafletting remains available outside the fixed event time zones, and the bubble preserves stationary and consensual communication; criminal liability additionally requires receipt of the statutory police communication. Once the merits errors are corrected, the District Court must weigh those actual burdens against the loss of lawful access protection during the litigation. The in-chambers stay opinions do not authorize enforcement of an unconstitutional law; they identify the concrete governmental harm that must be weighed when the challenged restrictions are defensible on the merits. Equity supports restoration of both provisions, or at minimum, preservation of every independently valid, severable part.

## CONCLUSION

This Court should reverse the order and vacate the preliminary injunction in its entirety because Plaintiffs failed to establish Article III standing on the preliminary injunction record. Dismissal without prejudice should be directed if Plaintiffs also lack standing under the standard applicable to maintaining their claims; a failure of preliminary injunction proof alone does not compel dismissal.

If the Court reaches the merits and identifies a residual constitutional defect, it should preserve the independently valid Bubble Provision, require the focused severability analysis described above, and confine any remaining relief to the provision or applications for which likely constitutional injury has been established.

Dated: October 14, 2026
White Plains, New York

Respectfully submitted,
ABRAMS FENSTERMAN, LLP
*Attorneys for Defendants-Appellants*

By: ______________________________
Robert A. Spolzino
81 Main Street, Suite 306
White Plains, New York 10601
(914) 607-7010

## CERTIFICATE OF COMPLIANCE

This brief complies with the type volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because it contains 11,506 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

By: ______________________
Robert A. Spolzino

# SPECIAL APPENDIX

# TABLE OF CONTENTS

Local Law No. 6-2025
(ECF Doc. No. 1-1) ........................................................................... SPA-1

Memorandum and Order of Hon. Sanket J. Bulsara,
Dated June 18, 2026
(ECF Doc. No. 37) ........................................................................... SPA-4

**Amendment in the Nature of a Substitution – Clerk Item 375-25**

**Introduced by:** Legislator Mazi Melesa Pilip, Presiding Officer Howard J. Kopel, Alternate Deputy Presiding Officer Michael Giangregorio and Legislators Scott Strauss, Patrick Mullaney, Samantha Goetz

**Cosponsored by:** Deputy Presiding Officer Thomas McKevitt and Legislators John J. Giuffré, C. William Gaylor, III, Rose Marie Walker, and James Kennedy, Minority Leader Delia DeRiggi-Whitton, Deputy Minority Leader Arnold Drucker, Scott Davis, Carrié Solages, Seth Koslow, Olena Nicks and Debra Mulé

LOCAL LAW NO. 6-2025

A LOCAL LAW TO PROHIBIT DEMONSTRATING WITHIN TEN (10) FEET OF ANOTHER PERSON ENTERING OR LEAVING A PLACE OF RELIGIOUS WORSHIP AND NOT WITHIN THIRTY-FIVE FEET (35) OF AN ENTRANCE

APPROVED AS TO FORM
Majority Counsel

**Passed by Nassau County Legislature on**
**12/17/25 A voice vote was taken with 17**
**Legislators present.**
**Voting: aye 17, nay 0, abstained 0, recused 0**
**Became a Local Law**

RECEIVED
NASSAU COUNTY
CLERK OF THE LEGISLATURE
2025 DEC 10 P 4:10

BE IT ENACTED by the County Legislature of the County of Nassau as follows:

Section 1. **Short Title.** This law shall be known as the "Religious Safety Act" and shall appear in the Miscellaneous Laws of Nassau County as Title 92.

§2. **Legislative Intent.**

This Legislature finds that individuals have a constitutional right to practice their religion and to safely travel to and from religious institutions without physical obstruction, interference, intimidation, or risk of injury.

This Legislature further finds that public safety and the right to religious freedom are threatened when demonstrators enter or remain in close proximity to those that are attempting to enter or leave places of religious worship.

Therefore, the primary purpose of this law is to protect public safety and the right to religious freedom by ensuring that demonstrators exercising their right to free speech be prohibited from demonstrating within thirty-five (35) feet of the Entrance Area or Driveway of a Place of Religious Worship and from approaching within a ten (10) foot distance of persons entering or leaving a Place of Religious Worship before, during, and after services.

§3. **Definitions.**

For the purposes of this law:

(1) "Place of Religious Worship" shall mean any church, synagogue, mosque, temple, or other building or location regularly used primarily for religious worship, religious education, or religious services.

(2) "Entrance Area" shall mean any doorway, threshold, entryway, gate, ramp, or other point of ingress or egress to a Place of Religious Worship.

(3) "Driveway" shall mean an entry from a public street to any parking lot in which the Place of Religious Worship has an ownership, easement or leasehold interest or other property right.

§4. **Prohibition on knowingly approaching for the purposes of demonstration within ten (10) feet of another person entering or leaving a Place of Religious Worship or demonstrating within thirty-five (35) feet of the Entrance Area or Driveway of a Place of Religious Worship.**

After receiving a verbal, written, or other communicative or expressive instruction, warning, or order from an officer of the Nassau County Police Department, and/or any Police Officer, as defined in Section 1.20(34) of the New York State Criminal Procedure Law, of an authorized Police Department or force of a city, town or village, or other police district or division within the geographic boundaries of Nassau County:

(a) It shall be unlawful for any person to knowingly approach within ten (10) feet of an individual, without such individual's expressed consent, for the purpose of demonstrating, picketing, protesting, distributing literature, displaying signs, engaging in oral advocacy, or other forms of expressive or symbolic conduct, whether conducted individually or in groups. This prohibition shall apply within one hundred (100) feet from the Entrance Area of any Place of Religious Worship, beginning one hour before the scheduled start of any religious service, community meeting, ceremony, or other congregational, educational or organizational meeting or event and ending one hour after the conclusion of any religious service, community meeting, ceremony, or other congregational, educational or organizational meeting or event; and

(b) It shall be unlawful for any person to demonstrate, picket, protest, distribute literature, display signs, engage in oral advocacy, or other forms of expressive or symbolic conduct,

whether conducted individually or in groups, within thirty-five (35) feet of the Entrance Area or Driveway of a Place of Religious Worship beginning one hour before the scheduled start of any religious service, community meeting, ceremony, or other congregational, educational or organizational meeting or event and ending one hour after the conclusion of any religious service, community meeting, ceremony, or other congregational, educational or organizational meeting or event.

§5. **Penalties.** Any person that violates any provision of this law shall be guilty of a misdemeanor punishable by a fine of not more than two hundred and fifty ($250.00) dollars or imprisonment of not more than one year, or both.

§6. **Severability.** If any clause, sentence, paragraph, subdivision, section or part of this local law or the application thereof to any person, individual, corporation, firm, partnership, entity or circumstance shall be adjudged by any court of competent jurisdiction to be invalid or unconstitutional, such order or judgment shall not affect, impair or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, subdivision, section or part of this law or in its application to the person, individual, corporation, firm, partnership entity or circumstance directly involved in the controversy in which order or judgment shall be rendered.

§7. **SEQRA Determination.** It is hereby determined by the Nassau County Legislature, the lead agency, and pursuant to the provisions of the State Environmental Quality Review Act ("SEQRA"), 8 NYECL section 0101 et seq. and its implementing regulations, Part 617 of 6 NYCRR, and Section 1611 of the County Government Law of Nassau County, that this Local Law will not have a significant impact on the environment and that no further environmental review or action is required.

§8. **Effective Date.** This law shall take effect immediately after becoming a law.

**APPROVED**

[signature]

**County Executive**

**Date** 1/12/26

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
CLAUDIA BORECKY & MARIATERESA THIERY,

Plaintiffs,

v.

COUNTY OF NASSAU, et al.,

Defendants.
--------------------------------------------------------------X

**MEMORANDUM AND ORDER**
26-CV-2049-SJB-ST

**BULSARA, United States District Judge:**

Nassau County's Religious Safety Act ("RSA"), Local Law No. 6-2025, prohibits individuals from engaging in picketing, oral advocacy, or literature distribution within 35 feet of entrances or driveways leading to houses of worship. This buffer provision is unprecedented. It also prohibits *all* expressive or symbolic conduct in that perimeter, including the most basic First Amendment activity, like wearing a t-shirt that contains a political, religious, or symbolic message of any kind. The RSA separately prohibits individuals—in a 100-foot bubble around the building's entrance—from going within 10 feet of a person to engage in any of the same conduct, without consent. Violations subject individuals to criminal penalties.

Plaintiffs Claudia Borecky and Mariateresa Thiery, who intend to engage in advocacy efforts on public streets adjacent to the County's many houses of worship, seek to preliminarily enjoin enforcement of the RSA. Both believe that supporting and welcoming immigrants is consistent with their Catholic faith. They claim that the law's benign purpose—to allow individuals to freely attend religious services and other

events at these places, without harassment or fear, and to ensure public safety—is inconsistent with the broad sweep of the law and constitutes a substantial infringement on core First Amendment activity. The Court agrees and grants the motion.

BACKGROUND

## I. The RSA

The RSA was introduced before the Nassau County Legislature's Committee on Public Safety on December 8, 2025. (Decl. of Elizabeth Gyori ("Gyori Decl."), Dkt. No. 13 ¶ 4). Its sponsor described its purpose: "to safeguard the right of Nassau residents to come in and leave the place of religious worship without fear of intimidation, harassment, physical obstruction, or assault." Nassau County Committees Legislature Meeting, (Vimeo, Dec. 8, 2025, at 15:02 ET), https://vimeo.com/1144492436, at 1:05:42–1:06:01. She acknowledged that the law was a response to a "disturbing" protest "with aggressive protestors" outside of Park East Synagogue in Manhattan, New York on November 19, 2025. (Gyori Decl. ¶¶ 5–8; *see also* Nassau County Committees Legislature Meeting at 1:05:42–1:06:15). The RSA was then passed unanimously during a full meeting of the Legislature on December 17, 2025. (Gyori Decl. ¶ 9).

At the December 17th session, Legislators explained their support of the law as a "proactive" response to both the Park East Synagogue protest and a mass shooting during a Hanukkah celebration on Bondi Beach in Sydney, Australia, a few days prior. (*Id.* ¶¶ 10–11). Legislator Arnold Drucker, who identified himself as a trained attorney, acknowledged that "in the past years [he] might've said, . . . I don't support things that

chip away at our constitutional freedoms," but now felt it "necessary" because he felt unsafe practicing his religion. (*Id.* ¶ 12).

The RSA contains an explicit statement of purpose: the need "to protect public safety and the right to religious freedom," which are "threatened when demonstrators enter or remain in close proximity to those that are attempting to enter or leave places of religious worship." (RSA, attached to Gyori Decl. as Ex. 1, Dkt. No. 13-1, § 2). The law seeks to further the constitutional rights of individuals "to practice their religion and to safely travel to and from religious institutions without physical obstruction, interference, intimidation, or risk of injury." (*Id.*).

Two provisions of the RSA are at issue. First, the law makes it unlawful for any person to:

> demonstrate, picket, protest, distribute literature, display signs, engage in oral advocacy, or other forms of expressive or symbolic conduct, whether conducted individually or in groups, within thirty-five (35) feet of the Entrance Area or Driveway of a Place of Religious Worship[.][1]

(*Id.* § 4(b)) (the "Buffer Provision"). Second, the law makes it unlawful for any person to:

> knowingly approach within ten (10) feet of an individual, without such individual's expressed consent, for the purpose of demonstrating, picketing, protesting, distributing literature, displaying signs, engaging in oral advocacy, or other forms of expressive or symbolic conduct, whether

[1] "Place of Religious Worship" includes "any church, synagogue, mosque, temple, or other building or location regularly used primarily for religious worship, religious education, or religious services." (RSA § 3(1)). An "Entrance Area" is "any doorway, threshold, entryway, gate, ramp, or other point of ingress or egress to a Place of Religious Worship." (*Id.* § 3(2)). And a "Driveway" is "an entry from a public street to any parking lot in which the Place of Religious Worship has an ownership, easement or leasehold interest or other property right." (*Id.* § 3(3)).

> conducted individually or in groups . . . within one hundred (100) feet from the Entrance Area of any Place of Religious Worship[.]

(*Id.* § 4(a)) (the "Bubble Provision").

Both the Buffer and Bubble Provisions are in effect from one hour before to one hour after "any religious service, community meeting, ceremony, or other congregational, educational or organizational meeting or event." (*Id.* §§ 4(a)–(b)). Criminal liability attaches only after an individual receives a "verbal, written, or other communicative or expressive instruction, warning, or order from an officer of the Nassau County Police Department" or "an authorized Police Department or force of a [Nassau] city, town or village." (*Id.* § 4). Such a violation is a misdemeanor punishable by a fine of up to $ 250 or imprisonment of up to one year, or both. (*Id.* § 5). The RSA became effective immediately after it was signed on January 12, 2026. (*Id.* § 8).

## II. The Plaintiffs

Borecky and Thiery are long-time residents of Nassau County who have regularly organized and engaged in protests throughout the county, including leafletting, displaying signs, and marching. (Decl. of Claudia Borecky ("Borecky Decl."), Dkt. No. 14 ¶¶ 6–11 (detailing role as founder and director of advocacy organization in the County and involvement with other civic organizations); Decl. of Mariateresa Thiery ("Thiery Decl."), Dkt. No. 15 ¶¶ 4–6, 8–9). Both are Catholic and believe that supporting and welcoming immigrants is consistent with their strong religious beliefs. (Thiery Decl. ¶¶ 5–8; Borecky Decl. ¶ 8).

On November 16, 2025, Borecky learned about the Catholic Bishops of New York State's "For You Too Were Once Aliens" statement ("Bishops' Statement") supporting

immigrants and opposing mass deportation. (Borecky Decl. ¶ 17; *see also* Bishops' Statement dated Nov. 13, 2025, attached to Gyori Decl. as Ex. 3, Dkt. No. 13-3). The Bishops' Statement describes Catholic teachings about immigrants' rights and calls on Catholics to sign the "Cabrini Pledge" (named after Mother Cabrini, the patron saint of immigrants) to commit one's prayers and energy to welcoming and protecting migrants. (Bishops' Statement at 2). Plaintiffs believed that while statements like these are usually inserts in a weekly parish bulletin and read aloud during Mass, several churches in the County had elected not to do so because of the political affiliations of church leaders and members. (Borecky Decl. ¶¶ 18–21; Thiery Decl. ¶ 17).

Seeking to spread awareness about the Bishops' Statement, and its pro-immigration position, Borecky developed a plan to share the Statement directly with churchgoers, with the hope of convincing them to sign the Cabrini Pledge and join leafletting activities outside of Nassau churches. (Borecky Decl. ¶¶ 21–23; Thiery Decl. ¶¶ 18–21). Borecky organized a group of volunteers, including Thiery, to distribute the Statement on fliers in pairs before or after Mass on December 21, 2025. (Borecky Decl. ¶¶ 22–23, 29, 33; Thiery Decl. ¶ 20). They planned to visit nine specific churches in Nassau County where they believed pastors or members would be ideologically opposed to sharing the message: St. Barnabas the Apostle, Sacred Heart, St. Raphael, St. Frances de Chantal, St. Francis, St. William the Abbot, Maria Regina, St. Rose of Lima, and Curé of Ars. (Borecky Decl. ¶ 23). The plan was to stand on the public sidewalks adjacent to the churches' entryways and driveways, approach parishioners as they were traveling to and from the church, and encourage them to take the flyer and sign the

Cabrini Pledge. (*Id.* ¶ 30; Thiery Decl. ¶ 21). They also planned to engage willing parishioners in conversation about religious teaching and their support for immigrant communities. (Borecky Decl. ¶ 30). Their intent was for these activities to be peaceful and nondisruptive, believing this strategy to be "the most appropriate and effective for communicating [their] message." (*Id.* ¶ 31). Thiery was looking forward to participating in this simultaneous action with other volunteers because of the importance of showing that many Catholics in the community care about the Bishops' Statement and immigrants' rights. (Thiery Decl. ¶ 22).

After the RSA was passed, Plaintiffs believed that their activities were prohibited by the law, since they planned to leaflet and conduct their activities on public sidewalks within 100 feet, if not 35 feet, of the entrances and driveways of the nine churches. (*Id.* ¶ 23; Borecky Decl. ¶ 35). Believing that the law would take effect immediately after it was passed, and fearing she and other volunteers would be arrested, Borecky cancelled the planned activities. (Borecky Decl. ¶¶ 35–36).

With the law in effect, Plaintiffs fear arrest and believe that they cannot share the Bishops' Statement or engage parishioners in conversation about their shared faith and immigrants' rights. (*Id.* ¶¶ 40–41; Thiery Decl. ¶¶ 24–25). Borecky has explored other means of sharing the Bishops' Statement to church members and leaders—including by having the statement included in parish bulletins—but such efforts have proven unsuccessful and she believes are, in any event, not as effective as leafletting and speaking directly with parishioners outside of churches. (Borecky Decl. ¶¶ 37–39).

Thiery separately had planned to distribute packets containing whistles and leaflets to churchgoers and church leaders entering and exiting storefront churches in Roosevelt and Freeport, New York. (Thiery Decl. ¶¶ 28–30). The packets contained know-your-rights leaflets for interacting with ICE and whistles to alert community members to the presence of ICE officers. (*Id.* ¶ 28). She feared arrest since storefront churches typically open directly onto public sidewalks, where she planned her activities to take place. (*Id.* ¶ 30; *see also* Exs. 61–66, attached to Decl. of Melissa Avilez Lopez, Dkt. No. 18-1 (measuring the distances from entrances and/or driveways of the storefront churches)).[2] Thiery considered alternative ways of distribution but could not determine how to do so while complying with the RSA, and abandoned the plan altogether. (Thiery Decl. ¶ 31).

With the RSA in effect, Plaintiffs contend that they do not have an effective way to spread their messages about their faith and immigrants' rights to the individuals and communities whom they would most impact. (*Id.* ¶ 24; Borecky Decl. ¶ 40). They also are concerned with how the RSA will impact their ability to attend protests and demonstrations in the future without risking arrest. (Thiery Decl. ¶ 34; Borecky Decl. ¶ 43). As such, they will not participate in any actions nor attend any protests outside a house of worship while the RSA is in effect. (Borecky Decl. ¶ 45; Thiery Decl. ¶ 37).

There are approximately 980 places of worship in Nassau County. (Decl. of Melissa Avilez Lopez ("Avilez Lopez Decl."), Dkt. No. 18 ¶ 5; *see also* Map of Places of

[2] All exhibits to the Avilez Lopez Declaration are available at Docket Number 18-1.

Worship in Nassau County, attached to Avilez Lopez Decl. as Ex. 1). Plaintiffs provided a report by a senior research and data strategist at the New York Civil Liberties Union identifying these places of worship and detailing the extent to which the RSA—because of the effect of the 35-foot buffer and 100-foot bubble—results in restrictions that extend onto public streets and sidewalks. (*See generally* Avilez Lopez Decl.).

First, the report identifies the entrances and driveways of the nine places of worship that Plaintiffs intended to visit. (*Id.* ¶¶ 21–23 (entrances represented by a symbol of a red doorway and driveways represented by a blue vehicle); *see also* Exs. 2–10, attached to Avilez Lopez Decl.). It then plots 35-foot buffer zones from the entrances (purple circles) and 35-foot buffer zones from the driveways (blue circles) in a close-up map for each church. (Avilez Lopez Decl. ¶¶ 24–25). These maps were placed next to navigation style maps. (*Id.* ¶¶ 25–26). For example, the map for St. Barnabas the Apostle depicts a 35-foot buffer zone at the driveway spilling over into the adjacent avenue, as well as three 35-foot buffer zones emanating from entrances that spill over onto public sidewalks. (Map of St. Barnabas the Apostle, attached to Avilez Lopez Decl. as Ex. 2). Similarly, the map for St. William the Abbot depicts three 35-foot buffer zones emanating from entrances and three 35-foot buffer zones emanating from driveways spilling over the adjacent sidewalks. (Map of St. William the Abbot, attached to Avilez Lopez Decl. as Ex. 7).

The report also presents close-up maps of three specific towns: Merrick, Hempstead, and Freeport. (Avilez Lopez Decl. ¶ 28). The Merrick map depicts eight

places of worship in close proximity to the Long Island Railroad station, (Merrick Map, attached to Avilez Lopez Decl. as Ex. 11), where Plaintiffs have gathered every month for protests to raise awareness on specific issues important to the community since March 2025, (Borecky Decl. ¶ 13). Four of the places of worship in the vicinity are lined up on one portion of Merrick Avenue, (Merrick Map), including St. John's Lutheran which has four different driveways/entrances within 30 feet of a public sidewalk, (St. John's Lutheran Measurements, attached to Avilez Lopez Decl. as Ex. 67).

In Hempstead, the combined effect of the density of places of worship and the RSA's zones of protection, threatens to make entire public streets off limits for any of the prohibited activities. (*See, e.g.*, Hempstead Map, attached to Avilez Lopez Decl. as Ex. 12). The Hempstead map plots 34 places of worship in one area of Hempstead. (*Id.*). There, many of the main streets are lined with stores, shops, and restaurants alongside places of worship. (Decl. of Susan Gottherer ("Gottherer Decl."), Dkt. No. 16 (attaching as exhibits images of storefront churches alongside beauty studios and restaurants)). In particular, eight places of worship line six blocks of Franklin Street, (Hempstead Map), and several open up directly onto a public sidewalk, (*see, e.g.*, Abundant Life Christian Center Measurements, attached to Avilez Lopez Decl. as Ex. 64 (depicting an entrance within 10 feet of a public sidewalk); Remnant Christian Network Measurements, attached to Avilez Lopez Decl. as Ex. 63 (within five feet of a public sidewalk); Iglesia Pentecostal Roca De Measurements, attached to Avilez Lopez Decl. as Ex. 66 (same)).

The report also chronicles the plethora of religious services, community meetings, and other events taking place at houses of worship. (Avilez Lopez Decl. ¶¶ 29–35). It specifically outlines the schedules of three houses of worship based on their websites. (*Id.*). The first is Our Lady of Loretto Catholic Church located in Hempstead which holds a recurring weekly schedule of mass in the morning, midday, and evening throughout the week; four community groups that meet throughout the week; and confession, youth group meetings, and religious education classes on Saturdays. (*Id.* ¶ 30). The Church also hosts bi-weekly or monthly religious ceremonies such as baptisms and weddings throughout the year. (*Id.*). The report provides a visual representation of the church's fixed schedule of recurring events and the corresponding times where the RSA's provisions are in effect, one hour before, during, and one hour after each event. (*Id.* ¶ 31; Our Lady of Loretto Catholic Church Calendar, attached to Avilez Lopez Decl. as Ex. 49). Based just on the weekly events, the Buffer and Bubble Provisions are in effect for about 12 hours a day.

The report also chronicles the events at Temple Sinai in Rosyln Heights which includes weekly Shabbat service and Torah Study; and it has an early childhood center that provides services during weekdays as well as religious school, adult programming, youth clubs, and a special needs program. (Avilez Lopez Decl. ¶ 32; Temple Sinai Calendar, attached to Avilez Lopez Decl. as Ex. 50). Based on the weekly events, the Buffer and Bubble Provisions would be in effect from about 6:30 A.M. to 6:30 P.M. Monday through Friday. (Temple Sinai Calendar). Similarly, the report chronicles the events at the Islamic Center of Long Island ("ICLI") in Westbury which holds weekly

prayer service and recurring programming such as weekend school for children, a preschool that operates Monday through Friday, a community food pantry on Saturdays, and a variety of other events hosted at the mosque such as cub scout meetings, art events, and a program for people with disabilities, among others. (Avilez Lopez Decl. ¶ 34; ICLI Calendar, attached to Avilez Lopez Decl. as Ex. 51). Based on the weekly schedule, the RSA's provisions would be in effect from about 5:00 A.M. to 10:00 P.M. every day of the week. (ICLI Calendar). The mosque also permits its premises to be booked for non-religious events such as family or athletic events. (Avilez Lopez Decl. ¶ 34).

Finally, the report measures the distances between the entrances and driveways of 20 houses of worship, including the nine churches Plaintiffs sought to visit, and the closest public sidewalks. (*Id.* ¶ 36). The report documents that all nine churches have at least one entrance or driveway that abuts or runs into a public street within less than 100- if not 35-feet. (*See* Exs. 52–60, attached to Avilez Lopez Decl. (images capturing the distance in feet between the churches and the closest public sidewalks with the shortest distance measuring about 5 feet)). Other examples include Mision Cristiana Elim in Hempstead, a storefront church whose entrance is only 1.84 feet from a public sidewalk, (Mision Cristiana Elim Measurements, attached to Avilez Lopez Decl. as Ex. 61), and ICLI in Westbury which has a public sidewalk within 82 feet of its entrance and 16 feet from a driveway, (ICLI Measurements, attached to Avilez Lopez Decl. as Ex. 69).

## III. Procedural History

Plaintiffs have named Nassau County, County Executive Bruce Blakeman, and Commissioner of the Nassau County Police Department Patrick J. Ryder as Defendants. (Compl. dated Apr. 7, 2026, Dkt. No. 1 ¶¶ 22–24). Plaintiffs assert four causes of action, alleging that the RSA violates: (1) the First Amendment right to freedom of speech and assembly under § 1983; (2) the Due Process Clause of the Fourteenth Amendment as void for vagueness under § 1983; (3) Article I, Sections 8 and 9 of the New York State Constitution, freedom of speech and assembly; and (4) Article I, Section 6 of the New York State Constitution's due process guarantee. (*Id.* ¶¶ 93–105).

On April 13, 2026, Plaintiffs moved for a preliminary injunction. (Pls.' Mem. in Supp. of Mot. for Prelim. Inj. ("Pls.' Mot."), Dkt. No. 12-1). The parties completed initial briefing, (Defs.' Mem. in Opp'n to Pls.' Mot. dated May 13, 2026 ("Defs.' Opp'n"), Dkt. No. 27; Pls.' Reply in Supp. of Pls.' Mot. dated May 19, 2026 ("Pls.' Reply"), Dkt. No. 31), and the Court held oral argument, (Tr. dated May 21, 2026 ("PI Tr."), Dkt. No. 36). The parties then submitted simultaneous supplemental briefing on May 29, 2026. (Defs.' Suppl. Letter in Opp'n ("Defs.' Suppl. Letter"), Dkt. No. 32; Pls.' Suppl. Letter in Supp. ("Pls.' Suppl. Letter"), Dkt. No. 33). For the reasons explained below, the motion is granted.

## LEGAL STANDARD

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)); *Daileader v. Certain Underwriters at Lloyds London*

*Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024). "When a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (quotation omitted). Typically, when seeking an injunction a plaintiff must also show that "the balance of equities tips" in their favor, *Daileader*, 96 F.4th at 356 (quotation omitted); however, if the "government is a party to the suit . . . inquiries into the public interest and the balance of the equities merge," *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021). The moving party must persuade the court that these elements have been satisfied through a "clear showing," in order to obtain "one of the most drastic tools in the arsenal of judicial remedies." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quotations and citations omitted).

Preliminary injunctions may be "mandatory" or "prohibitory." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id.* at 36–37 (citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)). The status quo in the context of a preliminary injunction is "the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam) (quoting *LaRouche v. Kezer*, 20 F.3d 68, 74 n.7 (2d Cir. 1994)). A party moving for a mandatory injunction, or an injunction that "will provide the movant with substantially all the

relief sought," which "cannot be undone even if the defendant prevails at a trial on the merits" must satisfy a heightened legal standard. *Yang v. Kosinski*, 960 F.3d 119, 127–28 (2d Cir. 2020) (quotations and citation omitted). The movant must both "(1) make a *strong* showing of irreparable harm, and (2) demonstrate a *clear or substantial* likelihood of success on the merits." *Id.* (emphasis added) (cleaned up). Here, Plaintiffs are seeking to have the RSA declared unconstitutional on as-applied and facial grounds, which is a form of prohibitory injunction because it would prohibit "government action by enjoining . . . future enforcement." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 (2d Cir. 2006) (finding First Amendment injunction on city law prohibitory because "it clearly does not command the City of New York or the [Department of Consumer Affairs] to perform any specific tasks"). Even if the more rigorous standard for a mandatory injunction applied, Plaintiffs would prevail. *See Yang*, 960 F.3d at 128 (assuming, for the sake of argument, that the more rigorous standard applies).

## DISCUSSION

### I. Likelihood of Success on the Merits: First Amendment As-Applied Challenge[3]

In a First Amendment challenge to a state or federal statute, "the likelihood of success on the merits is the dominant, if not the dispositive, factor." *Agudath Israel of*

[3] Plaintiffs also raise claims for violation of their free speech rights under the New York State Constitution. (Compl. ¶¶ 100–02). The "protection afforded by the [New York] State constitutional right of free expression (N.Y. Const., art. I, § 8) is as broad as that provided by the First Amendment," *People v. Ferber*, 57 N.Y.2d 256, 259 (1982), and "may in fact provide greater protection," *id.* Nonetheless, neither side suggests a different approach to evaluating constitutionality is warranted, or that the result of the federal scrutiny analysis would not lead to the same result under the State Constitution.

*Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) (quotation omitted). And that is because "the deprivation of First Amendment rights is an irreparable harm." *Id.*; *see also Volokh v. James*, 148 F.4th 71, 82 (2d Cir. 2025) (noting that for First Amendment injunctions "irreparable harm . . . track[s] closely with the constitutionality of the challenged statute"). "If the statute is likely consistent with the Constitution, then there is no constitutional harm, and the public interest benefits from allowing the democratic process to function through the legislature's voice; on the other hand, if the statute is likely unconstitutional, the public is irreparably harmed by the legislature's infringement on First Amendment freedoms and any resulting chilling effect on expression." *Volokh*, 148 F.4th at 82. Therefore, the Court begins its inquiry with whether Plaintiffs' have shown a clear likelihood of success on the merits on their claims that the RSA is unconstitutional. *See Beal v. Stern*, 184 F.3d 117, 123 (2d Cir. 1999).

The First Amendment, applicable to the states through the Fourteenth Amendment, *Gitlow v. New York*, 268 U.S. 652, 666 (1925), prohibits the government from making laws "abridging the freedom of speech," U.S. Const. amend. I; *see also Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) ("[The First Amendment] embodies [o]ur profound national commitment to the free exchange of ideas." (quotation omitted)). Courts employ differing levels of judicial scrutiny depending on the type of expression and the nature of the government restriction. *See Volokh*, 148 F.4th at 84.

Laws that target speech "because of the topic discussed or the idea or message expressed," *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015), or "[c]ontent-based"

regulations, are "presumptively invalid" and must satisfy strict scrutiny to withstand constitutional attack, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 395–96 (1992). By contrast, "[c]ontent-neutral time, place, and manner restrictions are subject to intermediate scrutiny." *Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 202 (2d Cir. 2013).

Here, the parties believe that the RSA is content-neutral, (Pls.' Mot. at 14; Defs.' Opp'n at 7), and the Court agrees. A content-based law is one that regulates speech based on its "communicative content" or "the topic discussed or the idea or message expressed." *Reed,* 576 U.S. at 163. "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Hill v. Colorado*, 530 U.S. 703, 719 (2000) (quotation omitted). The RSA does not do so. *See id.* at 723 (finding statute content-neutral because it "places no restrictions on—and clearly does not prohibit—either a particular viewpoint or any subject matter that may be discussed by a speaker"). Nor does it "require[ ] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (quotation omitted). "Whether petitioners violate the [RSA] depends not on what they say, but simply on where they say it." *Id.* (quotation and citation omitted). Therefore, the law's constitutionality turns on whether it can satisfy the less demanding intermediate scrutiny inquiry. *Lederman*, 731 F.3d at 202.

"[I]n a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech," *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), provided that the law "(1) 'advances important governmental interests unrelated to the suppression of free speech' and (2) 'does not burden substantially more speech than necessary to further those interests,'" *Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 160 (2d Cir. 2013) (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997)). "To establish that the law does not burden substantially more speech than necessary, the government must demonstrate that the law is 'narrowly tailored' to serve the relevant interest." *Cornelio v. Connecticut*, 32 F.4th 160, 171 (2d Cir. 2022) (quoting *Ward*, 491 U.S. at 796); *Vincenty v. Bloomberg*, 476 F.3d 74, 84 (2d Cir. 2007) (emphasizing that intermediate scrutiny does not demand the "least speech-restrictive means of advancing the Government's interests" (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994))). Further, given that the RSA restricts speech on public fora—streets and sidewalks being "the 'prototypical' traditional public forum," *Marcavage v. City of New York*, 689 F.3d 98, 104 (2d Cir. 2012) (quoting *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377 (1997))—it must "leave open ample alternative channels for communication of the information," *Ward*, 491 U.S. at 791. Because it is the government restricting speech, it bears the burden of demonstrating constitutionality. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816–17 (2000) (collecting cases).

**A. Nassau County's Interest**

The RSA's stated purpose is to "protect public safety and the right to religious freedom," (RSA § 2), noting that those rights are "threatened when demonstrators enter

or remain in close proximity to those that are attempting to enter or leave places of religious worship," (*id.*).

Religious liberty—the right to practice one's religion—is a core constitutional guarantee at the heart of the First Amendment. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19–20 (2020). The Government has a strong and separate interest in protecting public safety. *See McCullen*, 573 U.S. at 486 (recognizing state's interest in "ensuring public safety and order, [and] promoting the free flow of traffic on streets and sidewalks" (quotation omitted)); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) ("The State also has a strong interest in ensuring the public safety and order, [and] in promoting the free flow of traffic on public streets and sidewalks[.]"). And the Government's interest in the combination of the two—the interest in protecting those who wish to exercise their religious liberty from harassment or violence—is strong, indisputable, and significant.

Plaintiffs do not contest that the RSA implicates important government interests. (*See* Pls.' Mot. at 1 (acknowledging protections for individuals to safely practice religion "are of paramount importance and a significant government interest")). Instead, they contest the need for the law, including the evidentiary foundation for its enactment, in Nassau County. (Pls.' Suppl. Letter at 5–8). They argue that given the RSA's limited legislative history—the short discussion at two meetings, and the absence of committee findings or other evidence of particular threats to houses of worship in Nassau County—the Government's interest here is relatively generic and less powerful than in other cases.

The Court cannot deny that the record here is sparse. The legislative debate spans minutes. (*See* Gyori Decl. ¶¶ 5, 9). The incidents cited in support of the law's need are several premediated murders, from other jurisdictions, that do not involve incidents arising out of protests, leafletting, or discussions with parishioners. (*See* Defs.' Opp'n at 2–3; Gyori Decl. ¶ 10). And counsel for the County concedes that the legislative record and factual evidence in support of the law is virtually non-existent. (*See* PI Tr. at 17:8-10 ("There's no formal legislative history for this act. It's very limited. It was like a five minute discussion in the legislature."). Nor have Defendants provided testimony from religious leaders or congregants wishing to exercise their religious freedom in Nassau who felt intimidated, threatened, or unsafe because of protest activity.

Defendants attempt to supplant this record with newspaper articles. (*See* Decl. of Robert Spolzino ("Spolzino Decl."), Dkt. No. 28 ¶¶ 5–10). But again, these articles capture events in other jurisdictions and provide zero evidence of any specific acts of violence, intimidation, or threats to public safety at any religious institution in Nassau County. The only County-specific evidence presented was a supposed list of incidents involving Nassau County Police at places of worship. (*See* Police Report, attached to Decl. of Christopher Todd as Ex. 1, Dkt. No. 29-1 (a report by a Nassau County Police Department Bureau Chief logging incidents at houses of worship from 2021 to the present)). But this appears to be a list of times where police were called to the house of worship for an incident, and they relate to all manner of mundane complaints, including traffic violations and countless unspecified "suspicious occurrences." (*Id.*).

As for the few more serious incidents—including assaults—there is no indication of whether a crime was even charged. (*Id.*). But more to the point, there is no incident listed that has any indication of harassment, intimidation, or hate speech directed at someone seeking to attend a religious institution and arising out of a demonstration, picket, or even a large gathering. (*Id.*)

All that being said, at this stage, the Court accepts that there are important government interests served by the law. Plaintiffs' arguments—and the lack of evidence—may make it difficult for Defendants to prevail on public interest/balance of the equities factors, particularly in light of the detailed specific evidence of harm proffered by Plaintiffs. And given the wide scope of the law, a more generic presentation may pose difficulties in establishing the fit, that is, the narrow tailoring, of the law to the articulated interest, but the Court concludes that Defendants have established the RSA promotes a substantial government interest.

But before analyzing the narrow tailoring requirement, there is one additional argument that requires resolution. Plaintiffs seem to suggest that for laws like the RSA to survive intermediate scrutiny, there must be both "a strong record of repeated unlawful activity, such as violent and obstructive conduct, that threatens access to a particular site or people entering and exiting the location" and "a showing, including based on past enforcement, that existing or other laws have not and/or cannot sufficiently address this unlawful conduct." (Pls.' Mot. at 14).

In advancing the argument, Plaintiffs reference instances in which the Supreme Court considered a law or injunction's history. (*Id.* at 14–16). And so the argument

goes, in the absence of a detailed legislative history or evidentiary record supporting its enactment, the law must fail intermediate scrutiny. While it is true that courts have considered past incidents of harm or record evidence of the government's interest in evaluating a law's constitutionality, there is no requirement that such a foundation exist for the Government to take action. *E.g.*, *Hulinsky v. County of Westchester*, No. 22-CV-6950, 2025 WL 835646, at *9 (S.D.N.Y. Mar. 14, 2025) (rejecting plaintiffs' argument that the legislature's identification of only "one prior incident" was insufficient to justify the law, noting nothing suggested the "legislature may only consider a certain number of incidents or incidents within the county to justify new laws").

Legislatures are not required to wait for a local tragedy to act before preventing foreseeable harm. *See Burson v. Freeman*, 504 U.S. 191, 208–09 (1992) (upholding a 100-foot polling-place buffer where harm was reasonably foreseeable in the absence of extensive legislative hearings); *Mastrovincenzo*, 435 F.3d at 100 ("We ought not to second-guess a decision by the City Council—the elected representatives of the people of New York City—in the legitimate exercise of its recognized authority, to promote the public interest through local legislation[.]"). But, when they do act, they must do so in a way that is tailored to the interest they seek to advance and without unnecessarily burdening constitutional rights. The issue, therefore, does not turn on whether a history of past incidents exists, but rather an evaluation of how the regulation works to address this interest. *See, e.g.*, *Schenck*, 519 U.S. at 377 (striking down 15-foot floating

buffer zone despite repeated incidents of abusive conduct because law burdened too much expressive activity).[4]

### B. Narrow Tailoring and Alternative Channels for Communication

A law is narrowly tailored "'so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation' and does not 'burden substantially more speech than is necessary' to further that interest." *TikTok Inc. v. Garland*, 604 U.S. 56, 76 (2025) (quoting *Ward*, 491 U.S. at 799). Such a regulation "need not be the least restrictive or least intrusive means" of achieving the government's objective, but the "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 798–99.

"The First Amendment protects the right of every citizen to reach the minds of willing listeners and to do so there must be opportunity to win their attention." *Heffron v. Int'l Soc. For Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981) (quotation omitted). Therefore, "to be valid as a place and manner restriction, it must also be sufficiently clear that alternative forums for the expression of respondents' protected speech exist despite the effects of the [restriction]." *Id.* at 654; *Beal*, 184 F.3d at 130 ("Whether a

---

[4] The same goes for Plaintiffs' proposed standard requiring that before enacting new laws, legislatures must examine existing laws and determine that they fail to sufficiently address the harm. (Pls.' Mot. at 17 (citing, *inter alia*, the New York prohibition against criminal harassment, N.Y. Pen. L. §§ 240.25–30, and the federal prohibition against interference with people seeking to exercise their religious freedom, 18 U.S.C. § 248(a)(2)). Nothing requires Nassau County to engage in such an exercise, or to rely on discretionary enforcement of laws enacted by other jurisdictions, which would suggest it lacks police power over local concerns.

restriction leaves untouched ample alternatives for communication is not a formulaic inquiry, but depends on the nature of the forum sought, the nature of alternative fora, and the impact of the regulation on the ability of the regulated person or persons to get their message out.”).

The Court analyzes these two elements—narrow tailoring and alternative avenues of communication—with respect to the Buffer Provision and then the Bubble Provision.

**1. Buffer Provision**

The Buffer Provision makes it unlawful for any person “to demonstrate, picket, protest, distribute literature, display signs, engage in oral advocacy, or other forms of expressive or symbolic conduct” within 35 feet of an entrance or driveway of a place of worship. (RSA § 4(b)).

**a. Narrow Tailoring**

The Buffer Provision flunks the narrow tailoring inquiry. Plaintiffs’ plans include standing on public sidewalks adjacent to churches’ entryways and driveways, approaching parishioners, and encouraging them to take their flyers as they enter and exit. (Borecky Decl. ¶ 30; Thiery Decl. ¶ 21). And they intend to engage in two forms of solicitation and advocacy—handing out the Bishops’ Statement regarding immigrants while encouraging individuals to sign the related Cabrini Pledge in support, (Thiery Decl. ¶¶ 20–21; Borecky Decl. ¶¶ 29–31), and distributing whistles and know-your-rights packets about lawful interactions with ICE, (Thiery Decl. ¶¶ 28–29). Plaintiffs

consider it important to engage in peaceful and non-disruptive one-on-one conversation to effectively convey their message. (Borecky Decl. ¶ 31).

These activities are illegal under the RSA, as prohibited "oral advocacy," and literature distribution. Such solicitation is not only protected activity, *see Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 677–78 (1992), but "the essence of First Amendment expression," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). "No form of speech is entitled to greater constitutional protection," *id.*, because it has "historically been more closely associated with the transmission of ideas," than other forms of communication, *McCullen*, 573 U.S. at 488; *see also Schenck*, 519 U.S. at 377 ("Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment[.]").

The RSA imposes restrictions on such speech essentially without limitation as to time, and in some places over sidewalks and public streets. For example, Thiery had signed up to leaflet and advocate on the sidewalk outside of Sacred Heart in North Merrick and Curé of Ars in Merrick. (Thiery Decl. ¶ 20). Sacred Heart has at least two entrances and/or driveways adjacent to public streets, one within 12.5 feet and the other 26 feet, (Sacred Heart Measurements, attached to Avilez Lopez Decl. as Ex. 53), meaning at least 10 if not 20 feet of public sidewalk would have been off-limits, (*see also* Map of Sacred Heart, attached to Avilez Lopez Decl. as Ex. 3 (depicting another two buffer zones emanating from driveways that spill onto public streets)). Curé of Ars has at least two driveways that are approximately 13 and 16 feet from a public sidewalk, and the Buffer Provision therefore restricts any expressive conduct Thiery could engage

in on public sidewalks outside of the points of access. (Curé of Ars Measurements, attached to Avilez Lopez Decl. as Ex. 60; *see also* Map of Curé of Ars, attached to Avilez Lopez Decl. as Ex. 10 (depicting nine driveway buffer zones spilling over onto the adjacent avenues)). Thiery also planned to distribute whistle packets to churchgoers leaving storefront churches. (Thiery Decl. ¶ 28). But the entrances of storefront churches are, characteristically here, usually within a few feet of a public sidewalk. For example, Abundant Life Christian Center in Hempstead is within 10 feet of a public sidewalk, (Abundant Life Christian Center Measurements, attached to Avilez Lopez Decl. as Ex. 64), while Church of Christ in Hempstead has an entrance within three feet of a public sidewalk, (Church of Christ Measurements, attached to Avilez Lopez Decl. as Ex. 65). Around these places of worship, anywhere from 25 to 32 feet of public sidewalk are off-limits to Plaintiffs for First Amendment activity.[5] The combination of these effects imposes nothing less than "severe burdens" on Plaintiffs' activities.

And Nassau County's interests in protecting religious freedom and public safety are insufficiently linked to the imposition of such broad suppression. The Supreme Court's decision in *McCullen* is instructive. Massachusetts enacted a 35-foot buffer law prohibiting anyone—except employees, patients, and first responders, or those merely passing through—from entering or remaining "on a public way or sidewalk adjacent to

[5] While Defendants offer no expert analysis of their own, they contend that the impact of the Buffer Provision on public streets is insubstantial. (Defs.' Opp'n at 13). Not so. Plaintiffs' evidence demonstrates that 35 feet from an entrance or driveway of the nine churches they planned to leaflet at ends up including sidewalks or public streets. (Exs. 2–10, 52–60, attached to Avilez Lopez Decl.). And that all nine churches have a public sidewalk that abuts a church driveway. (*Id.*).

a reproductive health care facility[‘s]” entrance, exit, or driveway. *McCullen*, 573 U.S. at 471–72. “Sidewalk counselors” sought to engage in one-on-one conversations with persons entering the clinic to dissuade them from obtaining abortions. *Id.* at 472–73. And they sought to do so in a manner similar to the Plaintiffs here: by “offering information” with a “caring demeanor, a calm tone of voice.” *Id.* The Supreme Court concluded that the law was not narrowly tailored to achieve the important government interest in public safety and patient access to healthcare. *Id.* at 490, 493. Given the significant burdens on speech—restriction of core expression on public streets—the state had to provide greater justification for the law, which it failed to do. The law’s invalidation was compelled by the Court’s conclusion that Massachusetts could achieve its goals through more “targeted means,” *id.* at 493, and its failure to demonstrate that such “alternative measures that burden substantially less speech would fail to achieve the government’s interests,” *id.* at 495.

The same is true with respect to the RSA. If the goal is to avoid harassment, intimidation, violence, or threatening speech, the County could have drafted a law that criminalized such conduct. It need not have also banned peaceful conversation, polite exchange, and information distribution on public streets—what amounts to the “extreme step of closing a substantial portion of a traditional public forum to all speakers.” *McCullen,* 573 U.S. at 497. There is no evidence in this record that Nassau County considered any alternative laws or seriously engaged in any exercise of limiting the First Amendment damage inflicted by the RSA on individuals like Plaintiffs. The legislative debate lasted minutes with at least one legislator acknowledging the First

Amendment problems, but proceeding ahead nonetheless. *Supra* pp. 2–3. Had they considered alternatives, it would be easier to establish narrow tailoring. *E.g.*, *Bruni v. City of Pittsburgh*, 941 F.3d 73, 90 (3d Cir. 2019) ("Also as in *Madsen* and *Schenck*, the record shows that the City resorted to a fixed buffer zone not in the first instance but after attempting or considering some less burdensome alternatives and concluding they were unsuccessful in meeting the legitimate interests at issue.").

The existence of such alternatives is not theoretical; they were identified in the Defendants' own papers. In support of their argument that the RSA serves an important interest, they identified other existing laws that advance such goals. (*See* Defs.' Suppl. Letter at 2). But they do so in a far more targeted way. Such laws could have served as examples on how the County could have drafted its law. For example, the Freedom of Access to Clinic Entrances ("FACE") Act criminalizes conduct which "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2). Or the proposed Safeguarding Access to Congregations and Religious Establishments from Disruption ("SACRED") Act which would criminalize intentionally intimidating, obstructing, or harassing people exercising their right to religious worship within 100 feet of a place of worship by either threatening them, blocking their path, or approaching them within eight feet for the purpose of harassment or intimidation. (Press Release, attached to Spolzino Decl. as Ex. 8, Dkt. No. 28-1). These laws frame their prohibitions around the widely

understood conduct deemed illegal notwithstanding the First Amendment, instead of blocking all activities that ever occur around a religious location, without regard to their constitutional protection.[6]

There might have been a record that justified the impositions on protected speech from the Buffer Provision. But it is not here. For example, there is zero evidence that the kinds of activities Plaintiffs seek to engage in have ever escalated into problematic harassment or violence in Nassau County. Or that any particular congregant or parishioner has ever felt harassed or threatened or unable to fully exercise their religious liberties. To that end, there is also nothing that suggests that in the places where individuals arrive by car and park in lots often far from the driveway entrances to a location, it is necessary to enact a 35-foot barrier that spills over onto public streets to protect congregants and visitors.

To be sure, the record need not be hyper-localized (that is, necessarily come from Nassau County) or have a pattern of safety problems to enact laws under police power, vindicate rights, or protect public safety. But the broader the restriction on legitimate speech, the more is required to show the law is narrowly tailored. That is because narrow tailoring requires a law to "focus[] on the source of the evils [the County] seeks to eliminate . . . and eliminate[] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." *Ward*, 491 U.S. at 799 n.7; *see also Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 859 (9th Cir. 2004)

[6] The Court does not "give . . . approval to this or any other alternatives," *McCullen*, 573 U.S. at 492 n.8, but merely identifies some alternatives that Nassau County could have considered but did not.

("[M]erely invoking interests in regulating traffic around an exhibit or performance facility is insufficient. The government must also show that the proposed communicative activity endangers those interests." (citations omitted)); *Saieg v. City of Dearborn*, 641 F.3d 727, 739 (6th Cir. 2011) ("Mere speculation about danger is not an adequate basis on which to justify a restriction of speech." (cleaned up)).

And here there is no record to justify the restriction. Defendants submitted several articles chronicling escalating attacks on places of worship, (*see generally* Spolzino Decl.), to show "prevalent violence targeting houses of worship," (Defs.' Suppl. Letter at 9). These incidents are harrowing and it is undeniable that the government has an important interest in preventing such harm in its community. But they bear no relationship to precluding non-harassing, non-intimidating, peaceful protest or literature distribution or advocacy envisioned by Plaintiffs. Many of the incidents to which Defendants cite involved pre-mediated murder, (Defs.' Opp'n at 2–3 (citing to the December 2025 attack at Bondi Beach in Sydney)), or examples of crimes committed around places of worship not tied to the prohibited activities, *supra* pp. 19–20. And while the government very much has an interest in preventing such harm, the law, as written, burdens a substantial amount of speech that does not work to actually prevent it.

Defendants nonetheless contend the Buffer Provision is narrowly tailored because Plaintiffs can still engage in their speech from the buffer zone's line and that it implicates only a fraction of the public sidewalk available to speakers in most of the County. (Defs.' Opp'n at 8). But the question is less whether a fraction or large portion

of sidewalk is infringed, than whether the zone compromises Plaintiffs' ability "to initiate the close, personal conversations that they view as essential." *McCullen*, 573 U.S. at 487. The 35-foot zone pushes Plaintiffs back (to varying degrees) making it more difficult for them to attempt to engage in oral advocacy or share literature as parishioners enter and exit the church. *Id*. at 489 ("When the government makes it more difficult to engage in these modes of communication, it imposes an especially significant First Amendment burden."). It also forces them to change the nature of their interactions, from the polite one-to-one conversations they sought to engage in, (Borecky Decl. ¶¶ 30–31), to having to raise their voices to be heard, *see McCullen*, 573 U.S. at 487 (noting the burden on petitioner's speech in being forced to stop abruptly at the buffer zone, seeming "untrustworthy" or "suspicious" and being "reduced to raising her voice at patients from outside the zone—a mode of communication sharply at odds with the compassionate message she wishes to convey"). Plaintiffs do not mean to merely protest; they seek to engage their fellow Catholics in a conversation about their shared faith and values. (Thiery Decl. ¶ 21; Borecky Decl. ¶ 30); *see also McCullen*, 573 U.S. at 489–90 ("It is thus no answer to say that petitioners can still be 'seen and heard' by women within the buffer zones. If all that the women can see and hear are vociferous opponents of abortion, then the buffer zones have effectively stifled petitioners' message."). The Buffer Provision prevents these interactions, and arguably unnecessarily. *E.g., Bruni*, 941 F.3d at 90 ("[T]he Ordinance is narrower in scope because it limits only congregating, patrolling, picketing, and demonstrating within a fifteen-foot buffer zone, and does not sweep in the one-on-one communication,

including normal conversation and leafletting, that . . . have historically been more closely associated with the transmission of ideas." (quotation and citation omitted)).

Indeed, the Buffer Provision is "truly exceptional." *McCullen*, 573 U.S. at 490. Defendants do not identify any other "fixed buffer zones around," *id.*, religious institutions from any other jurisdiction. Defendants could not identify, and the Court could not find, a constitutional parallel—a blanket 35-foot buffer zone—approved by any circuit or the Supreme Court. (*See* Defs.' Suppl. Letter at 7 (admitting that "[n]o Supreme Court or Second Circuit decision addresses precisely this configuration"); PI Tr. at 20:7-10 (answering "No" when asked whether Defendants were aware of a single Second Circuit or Supreme Court case saying that the kind of zone at issue was permissible)).[7] That is not a basis to assume invalidity, but it suggests the County "has too readily forgone options that could serve its interests just as well," but without the impermissible speech burdens. *McCullen*, 573 U.S. at 490.

As applied to Plaintiffs' intended activities, the RSA's Buffer Provision is not narrowly tailored.

**b. Alternative Forums for Communication**

Plaintiffs contend that the Buffer Provision does not leave suitable alternative channels for communication to convey their particular message about their Catholic

[7] In *Madsen*, the Supreme Court partially blessed a 36-foot buffer around an abortion clinic's entrances and driveways, an injunction that banned "congregating, picketing, patrolling, demonstrating or entering any portion of the public right-of-way" in that zone. 512 U.S. at 768. But in so doing, the Court noted the distinction between such a restriction, one on "focused picketing," and "the type of generally disseminated communication that cannot be completely banned in public places, such as handbilling and solicitation." *Id.* at 769. The Buffer Provision is akin to the latter, not the former.

faith and immigration to parishioners before and after they attend church services. (Pls.' Mot. at 18). The Court agrees. The law forces Plaintiffs to limit their speech to at least 35 feet from the entrances and driveways of places of worship. That distance impedes, if not eliminates entirely, the ability of Plaintiffs to engage in the desired one-on-one conversations. In *McCullen*, the petitioners sought to do the same thing and the Court found that the buffer law "effectively stifled petitioners' message," leaving them with no adequate alternative. 573 U.S. at 489–90. The same is true here.

Defendants' proposed alternatives—that Plaintiffs demonstrate 35 feet away, leaflet during the hours there are no services, or stand stationary within the 100-foot bubble zone, (Defs.' Opp'n at 12; Defs.' Suppl. Letter at 6, 11)—are inadequate. Plaintiffs are not demonstrators, and are seeking to engage in solicitation—asking people to sign pledges of support of the Bishops' Statement and immigrants. Solicitation from 35 feet away would require shouting, the opposite of conversation and direct engagement. *See McCullen*, 573 U.S. at 489–90.

The Buffer Provision "push[es] [Plaintiffs] well back from the . . . entrances and driveways . . . compromis[ing] [their] ability to initiate . . . close, personal conversations." *Id*. at 487. Leafletting during non-service hours is not sufficient, it both diminishes the quantity and type of person Plaintiffs wish to converse with (since churches hold many events unrelated to faith, *infra* p. 45). Nor is standing stationary—in the hopes people will approach Plaintiffs—as it again confuses the kind of direct engagement sought by Plaintiffs towards parishioners with other kinds of

communications. In sum, the suggested alternatives force Plaintiffs to modify their message, methods, and intended audience.

The unrebutted record shows that Plaintiffs explored another alternative, such as directly engaging with clergy to encourage them to share the Bishops' Statement, but that was futile. (Borecky Decl. ¶¶ 37–39 (detailing Borecky's unsuccessful efforts with the pastor of Curé of Ars parish)). And Borecky testified that even if they had been successful, such as if the Curé of Ars pastor had posted the statement on their website, it would not have been an adequate alternative, as they sought an opportunity to directly engage with churchgoers about their faith and immigrants' rights. (*Id.* ¶ 39).

Therefore, the Buffer Law fails to provide a proper alternative channel for Plaintiffs' speech. *See, e.g.*, *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1079 (10th Cir. 2020) (finding defendant's alternative of moving to sidewalks away from car-heavy public medians on public roads insufficient because, among other reasons, "those seeking to hand out material or seeking to solicit funds" would be deprived of "safe and direct access to the driver" and would be "out of the sightline of drivers"); *United Yellow Cab Drivers Ass'n, Inc. v. Safir*, No. 98-CV-3670, 2002 WL 461595, at *9 (S.D.N.Y. Mar. 22, 2002) (finding defendants' alternative, rallying in front of the Taxi and Limousine Commission ("TLC") office, was not an adequate substitute when plaintiffs intended to direct their grievances at former Mayor Giuliani, not the TLC, and engage in a taxi procession as the "yellow cabs symbolized their livelihood," so "[n]either objective was advanced by the [alternative] demonstration").

**2. Bubble Provision**

The Bubble Provision makes it unlawful to "knowingly approach within ten (10) feet of an individual, without such individual's expressed consent, for the purpose of demonstrating, picketing, protesting, distributing literature, displaying signs, engaging in oral advocacy, or other forms of expressive or symbolic conduct" within a 100-foot bubble around the entrance to a place of worship. (RSA § 4(a)).

**a. Narrow Tailoring**

Defendants' entire defense of the Bubble Provision is the Supreme Court's decision in *Hill v. Colorado*, which they contend upheld a law materially indistinguishable from the RSA. (Defs.' Opp'n at 5–7).

In *Hill*, the Supreme Court analyzed a Colorado law that made it unlawful for anyone to go within eight feet of another person to distribute "a leaflet or handbill," display a sign, or engage "in oral protest, education, or counseling" without that person's consent. 530 U.S. at 707. The prohibition applied within a 100-foot bubble around the entrance to any Colorado health care facility. *Id.* Petitioners were "sidewalk counselors" who sought to educate and counsel passersby about abortion through conversation. *Id.* at 708.

The Supreme Court distinguished the 8-foot zone at issue from the 15-foot zone it had found unconstitutional in *Schenck*. In *Schenck*, the Court had concluded that a distance of 15 feet would preclude protestors from expressing their views from a "normal conversational distance." 519 U.S. at 377. The *Hill* Court concluded that was

not a problem at a distance of eight feet. 530 U.S. at 726–27 (citing *Schenck*, 519 U.S. at 377).

Defendants, offering nothing more than their own ipse dixit, contend that the two-foot difference between the law in *Hill* and the Bubble Provision is "not constitutionally meaningful." (Defs.' Opp'n at 6). But the difference is hardly negligible. *Cf. N.Y. ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 209 (2d Cir. 2001) (noting that "every incremental expansion in the size of buffer zones brings smaller benefits to patients and clinics, with greater injury to free speech"). And at a minimum, the two-foot difference makes it harder for Plaintiffs to engage in the "normal conversational distance" the Supreme Court upheld in *Hill*. Indeed, that is exactly what one Court of Appeals has concluded about a 10-foot buffer zone. *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 406 (6th Cir. 2022) ("By requiring . . . patients to be as much as ten feet away from Sisters [for] Life as they enter the Clinic, the buffer zone compromise[s] Sisters for Life's ability to initiate the close, personal conversations that are essential to its compassionate, person-to-person message." (quotations omitted)).

Regardless, it is not just a two-foot difference that distinguishes *Hill* from the Bubble Provision. Even if consensual, individuals in Nassau are required to cease all engagement within 35 feet of an entrance or driveway because of the Buffer Provision. The Colorado law in *Hill* allowed advocates to remain in one place, and others could pass within eight feet of the speaker without there being a violation. *See* 530 U.S. at 708 ("[I]t does not require a standing speaker to move away from anyone passing by.").

And that meant individuals could stand within 8 feet of the entrance. *Id*. at 729–30 ("[D]emonstrators with leaflets might easily stand on the sidewalk at entrances (without blocking the entrance) and, without physically approaching those who are entering the clinic, peacefully hand them leaflets as they pass by."). But that is not true here. While the Bubble Provision on its own allows for an individual to stay in place, the further limitation imposed by the Buffer Provision creates a meaningful distinction. Once an individual approaches the buffer zone, Plaintiffs' interactions are not crossing an 8-foot gap like in *Hill*, but instead a potential 35-foot gap.[8]

The separate problem with Defendants' reflexive reliance on *Hill*, is it waves away the specific context of Nassau County's enactment, presuming that *Hill* blessed all floating buffer zones with 8-foot bubbles. But it did no such thing. The very nature of the narrow tailoring inquiry requires an examination of the context in which the law at issue was enacted, and the record justifying (or not) the speech restriction. In *Hill*, there was an extended evidentiary record of disruption, emotional encounters, abusive language, confrontations, and other conduct that interfered with a patient's access to medical care. 530 U.S. at 709–10. That not only boosted Colorado's interest in passing its law, but also provided a foundation to prohibit displaying of signs, leafletting, and

[8] The Colorado law banned "oral protest." The RSA bans "oral advocacy." The difference might be semantic. *Compare Advocacy*, Black's Law Dictionary (12th ed. 2024) ("The art of pleading for or actively supporting a cause or proposal[.]"), *with Protest*, Black's Law Dictionary (12th ed. 2024) ("A formal statement or action expressing dissent or disapproval."). But at the same time, the RSA may have been written to prohibit speech, not conduct.

protest activities (even if it meant that peaceful, non-disruptive protestors could no longer exercise their rights). *See id*. at 729.[9]

**b. Alternative Forums for Communication**

Defendants largely use the same alternatives for the Bubble Provision as they did for the Buffer Provision, (Defs.' Opp'n at 12–13; Defs.' Suppl. Letter at 6), to argue Plaintiffs have other means of communicating their message. But for the same reasons they failed before, those alternatives fail here as well. The only wrinkle is they say that *Hill* itself concluded there were adequate alternatives. But *Hill* contemplated individuals standing still and providing information to individuals passing by, all the way up to the clinic's entrance. 530 U.S. at 729–30 (noting that "demonstrators with leaflets might easily stand on the sidewalk at entrances . . . and peacefully hand [those entering the clinic] leaflets as they pass by"). So the buffer zone in *Hill* still enabled First Amendment activity to occur at a facility's doorstep. *Id*. at 728. But the closest Plaintiffs can stand still and interact with individuals is 35 feet from an entrance. That significantly dilutes their ability to convey the same message, and suggests the County has not left open alternative channels.

[9] Defendants cite to and rely on the Third Circuit's blessing of an Englewood, New Jersey buffer zone law, (Defs.' Suppl. Letter at 11–12), but that law contemplated two eight-foot buffer zones emanating from either side of health care or transitional facilities' entrances and another zone that extended only the width of the entrance up to the public street, *Turco v. City of Englewood*, No. 22-2647, 2024 WL 361315, at *1 (3d Cir. Jan. 31, 2024). Neither the Bubble nor Buffer Provisions are comparable.

### 3. The Combined Effect of the Buffer and Bubble Provisions

Defendants have failed to articulate any rationale for having both a buffer and bubble provision to advance their interests in protecting religious liberty and public safety. The combined effect of the two exacts a chilling of free expression that neither does alone. For example, Plaintiffs who are trying to comply with the Bubble Provision would attempt to keep "pace with the targeted individual at the proscribed distance [to avoid] inadvertently violating the statute." *Hill*, 530 U.S. at 727. But in Nassau County, Plaintiffs are further required to take into account their distance from the driveway or entrance of the place of worship to not violate the Buffer Provision—a restriction that is not so forgiving of a speaker's awareness because it contains no mens rea requirement, and imposes liability even on accidental violations. Indeed, it is a strict liability provision. In other words, "it would be quite difficult for a protester who wishes to engage in peaceful expressive activities to know how to remain in compliance[.] . . . This lack of certainty leads to a substantial risk that much more speech will be burdened than the injunction by its terms prohibits." *Schenck*, 519 U.S. at 378. The additional chilling effect imposed by the dual provision underscores the lack of fit between the RSA and the objectives Nassau County intends to advance. *Cf. Brown v. City of Pittsburgh*, 586 F.3d 263, 282 (3d Cir. 2009) ("With the Ordinance's multi-zone restrictions, not only are leafletters unable to stand within fifteen feet of clinic entrances, but they are constrained from moving freely even outside of that protective zone. The fifteen-foot exclusion is a prophylaxis that effectively advances the City's interests. The additional burden of the bubble zone's restrictions would be, on this record, unduly—

and unconstitutionally—onerous. Accordingly, we find the Ordinance's combination of the two zones to be insufficiently tailored[.]").

Because the Buffer and Bubble Provisions are not narrowly tailored and fail to provide adequate alternative means of communication for their message—considered separately and together—Plaintiffs have shown a substantial likelihood of prevailing on the merits of their First Amendment challenge. *See Sisters for Life, Inc.*, 56 F.4th at 406 ("[T]he goal of the plaintiffs is not to harass or protest, whether loudly or violently. The point of their speech is to offer a compassionate ear. To this day, it remains unclear why the County has sought to suppress their speech along with those types of protests that are far more likely to hinder access to a clinic[.]").

## II. Likelihood of Success on the Merits: Facial Challenge to the RSA

Plaintiffs challenge the RSA on facial grounds as well. (Pls.' Mot. at 2; Pls.' Suppl. Letter at 4). A facial challenge "seeks to vindicate not only [a plaintiff's] own rights, but those of others who may also be adversely impacted by the statute in question." *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999). And while "facial challenges are generally disfavored, they are more readily accepted in the First Amendment context . . . 'based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court.'" *Beal*, 184 F.3d at 125–26 (quoting *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992)).

In evaluating a facial challenge, "[t]he question is whether a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly

legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quotation omitted); *see also Volokh*, 148 F.4th at 99 ("To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023))). "[A] law with a 'plainly legitimate sweep' may be struck down in its entirety . . . only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 723–24.

*Moody* sets forth the analysis the Court must undertake: it must first "assess the state laws' scope" and then (2) "decide which of the laws' applications violate the First Amendment, and . . . measure them against the rest." 603 U.S. at 724–25.[10] In other words, the court must "explore the laws' full range of applications—the constitutionally impermissible and permissible both—and compare the two sets." *Id.* at 726.

**A. The Buffer Provision**

As to scope, the Buffer Provision effects a complete ban on almost all, if not all, First Amendment activity within the 35-foot zone. It bans all demonstrations, picketing,

[10] Plaintiffs engage in an odd bit of, and ultimately unpersuasive, constitutional semantics. Despite asserting that they are making a facial challenge, (*see* Pls.' Mot. at 2), and advancing arguments about the RSA's broad sweep, (*see* Pls.' Suppl. Letter at 5 n.2), they claimed at various times that they are not making an overbreadth challenge, (*id.*; PI Tr. at 61:22–62:5). This makes no sense. A facial challenge in the First Amendment context is an overbreadth challenge unless the parties are engaging in all possible forms of conduct and activity prohibited by the challenged law (and if they were, the facial and as-applied challenges merge). That is rarely, if ever, the case, and Plaintiffs here are engaging in conduct that runs afoul of some, not all, of the prohibitions in the law, but still challenging the law on its face.

leafletting, signage—of any kind—within the zone. But it also bars speech itself. It prohibits all "oral advocacy" of any kind, regardless of content.

Yet it goes even further still. It prohibits all "other forms of expressive or symbolic conduct." (RSA § 4(b)). "[E]xpressive conduct" is understood to be conduct "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Texas v. Johnson*, 491 U.S. 397, 403–04 (1989). The same is true for symbolic conduct. *Virginia v. Black*, 538 U.S. 343, 358 (2003). Expressive and symbolic conduct covers the waterfront of the First Amendment—any conduct intended to express an idea or message and interpreted by those who viewed it as doing so. *Johnson*, 491 U.S. at 404; *Spence v. Washington*, 418 U.S. 405, 410–11 (1974). That is, everything from wearing a shirt with a political message, a religious pin, and simply standing or sitting in silence. *Johnson*, 491 U.S. at 404 ("[W]e have recognized the expressive nature of students' wearing of black armbands to protest American military involvement in Vietnam; of a sit-in by blacks in a 'whites only' area to protest segregation; of the wearing of American military uniforms in a dramatic presentation criticizing American involvement in Vietnam; . . . [and] attaching a peace sign to the flag." (citations omitted) (cleaned up)); *Chalifoux v. New Caney Indep. Sch. Dist.*, 976 F. Supp. 659, 665 (S.D. Tex. 1997) ("Plaintiffs wore their rosaries with the intent to communicate their Catholic faith to others."). It also likely includes the playing of any music. *Ward*, 491 U.S. at 790 ("Music [is] a form of expression and communication[.]").

Defendants admitted as much. (PI Tr. at 8:1-5, 10:16-18 (acknowledging that expressive conduct includes wearing a t-shirt with a political message, wearing a cross,

or wearing an armband)). The only First Amendment activity they could identify as permissible within the 35-foot zone was basic speech, i.e. conversation. (*Id.* at 10:25–11:2). Yet, Defendants contend that expressive and symbolic conduct should be understood as other forms of "protesting, oral advocacy, [and] displaying signs" and that the phrase only functioned as a "catch all for those." (*Id.* at 3:10-13). They rely on the canons of construction, including *ejusdem generis*—"general terms that follow specific ones are interpreted to embrace only objects of the same kind or class as the specific ones," *United States v. Amato*, 540 F.3d 153, 160 (2d Cir. 2008), *abrogated on other grounds by Lagos v. United States*, 584 U.S. 577 (2018)—to narrow the law's scope. *See also Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003) ("[U]nder the established interpretative canons of *noscitur a sociis* and *ejusdem generis* . . . the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (quotation omitted)). And, therefore, "expressive or symbolic conduct" should not reach "incidental expressive conduct such as a congregant wearing a political button, an individual wearing a t-shirt evocative of a political view, or a passerby displaying a bumper sticker." (Defs.' Suppl. Letter at 3). The argument is meritless.

The canon is inapplicable; neither side has alleged that the words expressive or symbolic conduct are ambiguous. *See Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980) ("The rule of *ejusdem generis*, while firmly established, is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty." (quotation omitted)); *cf. Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008) ("[W]e do not

woodenly apply limiting principles every time Congress includes a specific example along with a general phrase."). These words are not ambiguous in this context—counsel for Defendants had no trouble defining their reach, (PI Tr. 6:7-16, 8:2-5). Indeed, they are terms of art for the purposes of the First Amendment: there is a doctrinal test for determining whether the conduct is expressive or symbolic. *Johnson*, 491 U.S. at 404; *Spence*, 418 U.S. at 410–11. And there is therefore not an unlimited bound of activity that requires further definition or restriction. *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 65–66 (2006) ("[W]e [have] rejected the view that conduct can be labeled speech whenever the person engaging in the conduct intends thereby to express an idea. Instead, we have extended First Amendment protection only to conduct that is inherently expressive." (quotation omitted)).

Furthermore, the terms "demonstrating, picketing, protesting, distributing literature, displaying signs, engaging in oral advocacy," encapsulate separate and distinct forms of expression. *See City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994) ("[S]igns are a form of expression[.]"); *United States v. Grace*, 461 U.S. 171, 176, 181 n.10 (1983) (noting picketing and leafletting are "two types" of expressive conduct). And that makes these canons inapposite. *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 521–22 (2d Cir. 2023) (rejecting application of the *ejusdem generis* canon where the three items preceding the general term did not fit into a single clear "class").

Notably, Defendants' interpretation makes little sense and would render the phrase superfluous. Had the Legislature intended to limit the law to expressive conduct such as demonstrating or protesting, it would have been unnecessary to

include the phrase at all. Said differently, Defendants do not identify picketing or protest activity that does not fall within the words that precede the term "other expressive or symbolic conduct," while simultaneously not sweeping in basic expressive conduct of wearing shirts or buttons or actions intended to convey a message. Defendants are seeking to narrow the otherwise plain meaning of the terms because the broad scope of the RSA has no precedent or adequate justification. But the Court cannot simply ignore the text of what was promulgated. *Cf. United States v. Powell*, 423 U.S. 87, 90 (1975) ("The thrust of respondent's argument is that the more general language of the statute ('firearms') should be limited by the more specific language ('pistols and revolvers') so that the phrase 'other firearms capable of being concealed on the person' would be limited to 'concealable weapons such as pistols and revolvers.' We reject this contention. The statute by its terms bans the mailing of 'firearms capable of being concealed on the person[.]'" (quoting 18 U.S.C. § 1715)). Therefore, the Court interprets the Buffer Provision to preclude *all* forms of expressive or symbolic conduct—first picketing, oral advocacy, protesting, sign display, and second, the additional category of other symbolic or expressive conduct—*and* speech itself, in the form of "oral advocacy."

The geographic scope is similarly sweeping. The Buffer Provision makes no attempt to accommodate the diversity and types of institutions around which the restriction operates. There are nearly 1000 such places, some are in storefronts, some which abut private business, others on detached pieces of property, others abutting sidewalks and public thoroughfares. *Supra* pp. 8–11. And as a result, the 35-foot radius

around a driveway or entrance prohibits activity in all manner of places—including core public forums like sidewalks and streets—without regard to the particular site or location of any individual place of worship.

Then, there are the times of day during which the Buffer Provision operates. Houses of worship in Nassau County serve as far more than merely places to hold religious services. They act as de facto community centers, where any manner of non-religious activities are held: civic, educational, and political. Defendants offer no rebuttal to Plaintiffs' evidence showing that this is the operational reality of many of these places. (*See* Avilez Lopez Decl. ¶¶ 30–31 (detailing that for one specific place of worship, Our Lady of Loretto Catholic Church in Hempstead, a review of the church's website chronicled mass in the morning, midday, and evening throughout the week, community groups meeting throughout the week, weekly educational programing, bi-weekly events, and sporadic events such as weddings throughout the year); *see also id.* ¶¶ 32–35 (similarly chronicling the range of events and approximate time spans of events at a local synagogue and mosque)). Several days a week the Buffer Provision would be in effect for the entire day at some locations. (*See* Our Lady of Loretto Catholic Church Calendar; Temple Sinai Calendar; ICLI Calendar). The RSA itself recognizes the multi-purpose use of these locations. The Buffer Provision operates an hour before, during, and one hour after any "community meeting, ceremony, or other congregational, educational or organizational meeting or event." (RSA § 4(b)). That turns the Buffer Provision into a restriction that operates essentially at all hours when a

location is open—not just when there are religious events occurring or when individuals are coming to and from religious services.

For the next step of *Moody*—to identify the unconstitutional and constitutional applications of the RSA and compare the two—the Court has to engage in some amount of surmise and speculation. That requires an examination of the sweep of the Buffer Provision, as a content-neutral time, place, and manner restriction and whether its many applications could survive narrow tailoring.

First, the unconstitutional applications. As noted, the Buffer Provision prohibits all expressive and symbolic conduct. That provision alone makes illegal a breathtaking amount of protected activity, including expression that is commonplace, non-controversial, and non-disruptive: wearing any t-shirt, hat, or button with any message; advertising a business, whether it be religious, non-denominational, political, or sports-related; and any behavior of any kind that is expressive—standing in silence, sitting, singing, or even playing music at a low volume. And then there is the conduct that localities have tried to suppress because it appears to be disruptive, but to which the First Amendment gives breathing space, because the government may not sterilize public spaces from "insulting, and even outrageous" speech, *Boos v. Barry*, 485 U.S. 312, 322 (1988): the *Tinker* anti-war armband, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–06 (1969); the jacket expressing "F*** the draft," *Cohen v. California*, 403 U.S. 15, 16, 18 (1971); and carrying a flag that has been superimposed with a peace symbol, *Spence*, 418 U.S. at 409.

Then the Buffer Provision goes on to ban "oral advocacy," a term that is not defined in the RSA. That ban on speech prohibits even the most basic conversation where two individuals have (even slightly) differing views about any subject, whether it be a point of theological principle, political affiliation, sports allegiance, or even where to go to eat after services or whose car to drive to that lunch.

The Buffer Provision then bans all signs, demonstrations, and protest, but without any exception based on size, propensity to disrupt, or any other fact. Such activities are core First Amendment speech and conduct. *See Cox v. Louisiana*, 379 U.S. 559, 574 (1965) ("[O]ur constitutional command of free speech and assembly is basic and fundamental and encompasses peaceful social protest, so important to the preservation of the freedoms treasured in a democratic society."); *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) ("[T]he First Amendment protects political demonstrations and protests—activities at the heart of what the Bill of Rights was designed to safeguard."); *Marcavage*, 689 F.3d at 104 ("Plaintiffs' display of a political sign constituted political speech, which is entitled to the fullest possible measure of constitutional protection." (quotation omitted)).

The Buffer Provision is a classically "broad prohibition, both because of the type of speech [and conduct] that is restricted and the nature of the location." *Schenck*, 519 U.S. at 377; *see also Heffron*, 452 U.S. at 650–51 ("[R]elevant to the constitutionality of a regulation . . . [is] the characteristic nature and function of the particular forum involved."). What is undisputed is that the Buffer Provision ends up extending onto public streets and sidewalks. (The only dispute is about how much intrusion there is—

and it is at least significant in the particular areas identified by Plaintiffs, *supra* p. 8.) Public streets "have 'immemorially been held in trust for the use of the public and . . . have been used for the purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Heffron*, 452 U.S. at 651 (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)). The RSA makes no attempt to restrict its reach to avoid these quintessential public fora. And because it affects both conduct and speech, the RSA creates an almost total First Amendment ban in core public spaces.

It is difficult to imagine that any of the applications of the Buffer Provision described above could survive intermediate scrutiny.

*First*, as explained above, the Buffer Provision's ban on Plaintiffs' proposed conduct—core leafletting and non-disruptive conversation—is not narrowly tailored. It is also unprecedented.

*Second*, the geographic and temporal overbreadth—the Provision's application to all places of worship without distinction and to almost all times of day, regardless of when services take place—poses an additional hurdle to justifying the breathtaking scope of the other provisions. *See Sisters for Life, Inc.*, 56 F.4th at 404 ("'For a problem shown to arise only . . . at one clinic,' authorizing buffer zones 'at every' Louisville-Jefferson facility 'is hardly a narrowly tailored solution.'" (quoting *McCullen*, 573 U.S. at 493)).

To be sure, it may be difficult to distinguish religious and non-religious meetings, and congregants may be entering and exiting a place of worship at all hours of the day; such realities may necessitate a broader law. But here, the RSA targets non-

religious activities—any community meeting or event—for inclusion in the ban. In other words, even in the situations where there is no administrability problem—and it is plain that a non-religious event or meeting is being held and no person's religious freedom is possibly being infringed—the Buffer Provision would still be in effect. The temporal limitation does not narrowly tailor the law to the moments at which worshippers are "most vulnerable," participating in religious service, as Defendants contend, (Defs.' Opp'n at 7); it spans much further, burdening substantially more speech than necessary to serve its goals, *Ward*, 491 U.S. at 799.

*Third*, the ban on expressive or symbolic conduct "foreclose[s] an entire medium of expression," and therefore raises "particular concern." *City of Ladue*, 512 U.S. at 55. The same is true of the ban on oral advocacy. Because the law draws no distinction between permissible or impermissible speech, and instead between speech that is "advocacy" and that is not—a distinction that is perhaps forever indeterminate—anyone entering the Buffer Zone would be chilled. It would be safer to remain mum and stop speaking than to have the County charge you criminally for engaging in advocacy. The "danger" these two bans—of all oral advocacy and expressive conduct—"pose to the freedom of speech is readily apparent. [B]y eliminating a common means of speaking [and communicating], such measures can suppress too much speech." *Id.*

*Fourth*, the ban on signs, demonstrations, and protests covers all such activity regardless of its relationship to the harms sought to be avoided—disruption, harassment, violence, or interference with the ability to attend religious services. An

individual's single protest is as unlawful as a group's under the law. (*See* RSA § 4(b) ("whether conducted individually or in groups")). And a silent, nondisruptive protest or small sign is treated as equally problematic as the kinds of protest activities and demonstrations that bar and impede access, or inflict harm that even the First Amendment does not tolerate. By not having any exception or latitude for protected speech, these restrictions on these activities create a host of unconstitutional applications of the Buffer Provision.

There is also no record proffered by Nassau County. And that evidentiary lacuna makes it nearly impossible for Defendants to justify any of the exceptionally broad and comprehensive prohibitions on speech and conduct, including in classic public fora, contained in the Buffer Provision. *See Sisters for Life, Inc.*, 56 F.4th at 404 ("A critical feature of this inquiry turns on whether the County 'seriously undertook to address' the problems it faces 'with less intrusive tools readily available to it.'" (quoting *McCullen*, 573 U.S. at 494)). For example, in "some situations, a record of abusive conduct makes a prohibition on classic speech in limited parts of a public sidewalk permissible." *Schenck*, 519 U.S. at 377. But here there is no record of "physically abusive conduct, harassment of the police that hampered law enforcement, [or] the tendency of even peaceful conversations to devolve into aggressive and sometimes violent conduct," *id.*, or anything similar. Nor is there any evidence of considering any alternatives, *supra* pp. 2–3, before enacting the provision. *See Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 128 F. Supp. 3d 597, 618 (E.D.N.Y. 2015) (finding that a law was not narrowly tailored where it banned "speech and conduct of

an expressive nature that d[id] not pose a threat to safety on the Town's streets and sidewalks").

The uphill battle that Defendants would have in establishing narrow tailoring for many of the Buffer Provision's applications ends up limiting the situations where the law could be applied constitutionally. The constitutional applications are likely only those elements of speech and conduct that fall outside of First Amendment protection like "fighting words," *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *see also Black*, 538 U.S. at 359, or the most basic time and manner restrictions on individuals who block entrances and preclude ingress and egress, *e.g.*, *Cameron v. Johnson*, 390 U.S. 611, 622 (1968) ("All that [the statute] prohibits is the obstruction of or unreasonable interference with ingress and egress to and from public buildings, including courthouses, and with traffic on the streets or sidewalks adjacent to those buildings.").

Because the constitutional applications of the Buffer Provision are far and few, the comparison demanded by *Moody*—to the unconstitutional applications—is lop-sided. The unconstitutional reach is substantial and grossly disproportionate to the legally permissible reach of the law. To protect religious worshippers from intimidation, harassment, and violence, the Buffer Provision sweeps in First Amendment activity regardless of whether it runs the risk of being disruptive. The law covers all signs, all oral advocacy, and all forms of demonstration (even silent ones). Then it bans all expressive and symbolic conduct. It does so by imposing its 35-foot buffer regardless of the nature of any specific location, and without any exceptions or permitted deviations. As a result, the limits extend out to sidewalks and public spaces,

places that occupy a "special position in terms of First Amendment protection because of their historic role as sites for discussion and debate." *McCullen*, 573 U.S. at 476 (quotation omitted).

Essentially shutting down all First Amendment activity within 35 feet of a driveway or entrance to a place of worship, when there is little basis to infer narrow tailoring, necessarily will sweep in a substantial amount of First Amendment activity. And that permits the law to be struck down on facial grounds. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 967–68 (1984) ("Where, as here, a statute imposes a direct restriction on protected First Amendment activity, and where the defect in the statute is that the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack."); *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984) ("[W]here the statute unquestionably attaches sanctions to protected conduct, the likelihood that the statute will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack.") (quotations omitted); *cf., e.g.*, *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) ("[T]he resolution at issue in this case reaches the universe of expressive activity, and, by prohibiting *all* protected expression, purports to create a virtual 'First Amendment Free Zone' at LAX.").[11]

---

[11] The absence of any scienter requirement for violation of the Buffer Provision also makes it more likely that individuals are chilled in their exercise of basic First Amendment speech and conduct. *See Smith v. California*, 361 U.S. 147, 154 (1959). The fact that a warning is issued before the offense becomes criminal does nothing to solve this defect, because the warnings have no guardrails themselves. *Infra* pp. 54–56.

**B. The Bubble Provision**

The differences between the Buffer and Bubble Provisions do not save the latter from facial invalidity. The locus of the Bubble is different—applying only to entrances, not driveways—and it is a floating zone (extending 100 feet, 10 feet around every person). The substantive limits are the same, including a ban on demonstrating, picketing, literature distribution, sign display, oral advocacy and expressive conduct. The only meaningful difference is that liability is imposed only if a person approaches another and does so knowingly.

But that alters nothing about the *Moody* analysis. The same conduct is both constitutional and unconstitutional, and the quantum of unconstitutional applications is still breathtaking and substantial. All the mens rea component does is exclude someone's accidental or inadvertent approaches from criminal liability. The Bubble Provision still applies to an approach by anyone wearing a shirt or hat with a political message or any other message within 10 feet of an individual (an individual that does not even have to be on their way to the event or part of the congregation, just within the 100-foot zone). As a result, that provision is likely facially invalid. *See Madsen*, 512 U.S. at 773–74 (striking down a 300-foot no approach zone as difficult to justify given that it was "a prohibition on *all* uninvited approaches of persons seeking the services of the clinic, regardless of how peaceful the contact may be," burdening "more speech than is necessary to prevent intimidation and to ensure access to the clinic").

### C. The RSA's Enforcement Mechanism

There is an independent basis that makes the RSA susceptible to invalidation on a facial basis: the unbridled discretion of an officer to police violations of the law.[12]

The RSA provides that an individual faces criminal liability after they "receive[] a verbal, written, or other communicative or expressive instruction, warning, or order" from an officer. (RSA § 4).

Given the breadth of the expressive conduct and speech implicated by the law, an officer is left with the discretion to determine whether the individual standing in silence wearing a t-shirt with a political message is violating the statute or not engaging in expressive conduct at all. "Because of its overbreadth, the statute vests local law enforcement officers with too much arbitrary discretion in determining whether or not a certain emblem is grounds for prosecution. It permits only that expression which local officials will tolerate[.]" *Long Island Viet. Moratorium Comm. v. Cahn*, 437 F.2d 344, 350 (2d Cir. 1970), *aff'd*, 418 U.S. 906 (1974); *cf. Cox v. Louisiana*, 379 U.S. 536, 557–58 (1965) ("It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power, or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute."). To be sure "perfect clarity and precise guidance have never been required even of regulations that restrict

[12] Plaintiffs frame these arguments under a due process and vagueness rubric, but they apply with equal force to their facial challenge.

expressive activity." *Ward*, 491 U.S. at 794. But the RSA's breadth gives officials "unguided discretion to deny the right to speak altogether." *Id.* There are no rules, standards, or guidelines to determine what constitutes conduct that violates the law. And some of the prohibitions are inherently murky. *Supra* pp. 41–42.

Relatedly, the law is standardless as to what "instruction, warning, or order" is sufficient to trigger criminal liability. The law as written could encapsulate anything from a loud and clear instruction to disperse or risk criminal liability to a simple raising of the arm and pointing down the street. Defendants contend the notice provision actually works to protect speakers—and saves the RSA from facial invalidation—because it gives individuals an opportunity to comply before facing criminal liability. (Defs.' Opp'n at 13–14). But a warning that is governed by no standards, and asks officers to interpret the same murky and overbroad provisions that are constitutionally problematic, serves no limiting function. "It is not the penalty itself that is invalid, but the exaction of obedience to a rule or standard that is so vague and indefinite as to be really no rule or standard at all." *Champlin Refin. Co. v. Corp. Comm'n of Okl.*, 286 U.S. 210, 243 (1932); *cf., e.g.*, *Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 731 (7th Cir. 2025) ("We also acknowledge that the buffer law requires a do-not-approach warning before subjecting an individual to arrest. But that does not immunize the buffer law from arbitrary or discriminatory enforcement. As the plaintiffs point out, the problem is more upstream: the buffer law offers no guidance to the officer deciding whether a [do-not-approach order] should issue in the first place." (quotation omitted)).

For these reasons, Plaintiffs have shown a substantial likelihood of success on their facial challenge to both the Buffer and Bubble Provisions. *Hansen*, 599 U.S. at 770 ("If the challenger demonstrates that the statute prohibits a substantial amount of protected speech relative to its plainly legitimate sweep, then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid." (quotation omitted)).

* * *

The Court highlights another issue with the RSA—one that reflects its wide breadth and substantial burden on free speech, but the parties have not addressed. For now. The Buffer Provision creates no distinction of the radius by which to measure the 35-foot prohibition (for example, limiting the 35-foot radius to the exterior of a building). Nor does it limit the buffer zone's reach to public land. That is to say, the buffer zone may include adjacent private properties and the insides of the places of religious worship themselves. (*See, e.g.*, Gottherer Decl. ¶¶ 3–4 (testifying to the many commercial areas in Hempstead that include streets fully lined with stores, shops, and restaurants alongside places of worship and attaching images depicting storefront churches adjacent to commercial buildings such as restaurants)). The same is true for the Bubble Provision. (*Id.*).

Neither side disputes that the plain text of the law encapsulates private as well as public spaces. (*See* PI Tr. at 16:23–17:23, 59:2-18). And Plaintiffs have at least alluded to the possibility that they would have engaged in their desired speech on private land if permitted. (*See* Borecky Decl. ¶ 30 ("If we had reason to believe that a church had

traditionally permitted members of the public to step onto their private pathways for leafletting and engaging in conversations with worshippers, we would also try to see if we could leaflet and speak with churchgoers on those pathways leading to and from the entrances.")). It is quite extraordinary for a government to impose restrictions on or criminalize speech within private spaces.

Regardless of what the ultimate burden on speech in private spaces may be, its mere implication suggests that the law is facially overbroad. *See Madsen*, 512 U.S. at 771 (state court injunction's inclusion of private property on back and side of abortion clinic in 36-foot buffer zone, from which anti-abortion protestors were excluded, burdened more speech than necessary to protect access to clinic); *cf. Spitzer*, 273 F.3d at 207 (noting that the buffer zones in front of the neighboring dry-cleaning business and gas station were "particularly suspect").

The parties do not meaningfully engage with this issue in their papers, apparently satisfied with limiting the analysis to activity outside of places of worship and on public fora, and it is not necessary in granting the preliminary injunction. But the Court finds these additional implications of the RSA troubling and further indicative that the Defendants are likely to lose on the merits—warranting a preliminary injunction.

**III. Severability**

Defendants ask the Court to utilize the RSA's severance provision and excise unconstitutional portions of the law. (Defs.' Suppl. Letter at 15).

The RSA § 6 provides:

> If any clause, sentence, paragraph, subdivision, section or part of this local law or the application thereof to any [person or entity] or circumstance shall be adjudged by any court . . . to be invalid or unconstitutional, such order or judgment shall not affect, impair or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph subdivision, section or part of this law or in its application to the [person or entity] or circumstance directly involved in the controversy[.]

(RSA § 6).

"Severability is of course a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). "The basic rule governing severability was elegantly put by Judge Cardozo decades ago: 'The question is in every case whether the legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether.'" *CWM Chem. Servs., L.L.C. v. Roth*, 6 N.Y.3d 410, 423 (2006) (quoting *People ex rel. Alpha Portland Cement Co. v Knapp*, 230 N.Y. 48, 60 (1920)). Analyzing severability "requires first an examination of the statute and its legislative history to determine the legislative intent and what the purposes of the new law were, and second, an evaluation of the courses of action available to the court in light of that history to decide which measure would have been enacted if partial invalidity of the statute had been foreseen." *Id.* at 423 (quotation omitted).

Here there is no meaningful legislative history, and the intent of the Legislature is present in the statute itself—RSA § 6 contemplates and prefers severance. *Cf. Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 624 (2020) ("[A] severability or nonseverability clause leaves no doubt about what the enacting Congress wanted if one provision of the law were later declared unconstitutional."). But that is hollow guidance. Why? Because the constitutional defects pervade both the Buffer and Bubble

Provisions, and there is no indication whether the Legislature would have preferred one over the other. And because the defects affect both substantive provisions of the law, excising them in their entirety leaves nothing. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) ("[T]he invalid part may be dropped *if* what is left is fully operative as a law." (emphasis added) (quotation omitted)). Further, it is impossible to excise subsets or sub-portions of either provision—for example, by removing the bans on oral advocacy and expressive and symbolic conduct—without also gutting large portions of both provisions, and it is unclear whether the remaining portions would still be facially valid. Fundamentally, to remove the unconstitutional provisions of the RSA and limit the law to the bare minimum restrictions justified by the County's meager record, would necessitate creating law that prohibited "fighting words," prohibited harassment and violence towards parishioners, and prevented blocking of entrances to buildings. But that is not a severance exercise, but one in legislative redrafting, which the Court cannot do. *See Reno v. ACLU*, 521 U.S. 844, 884–85 (1997).[13]

**IV. Irreparable Harm**

Because Plaintiffs have established a substantial likelihood of success on the merits of both their as-applied and facial challenges to the RSA, they have established

[13] It also may be premature to sever a statute at the preliminary injunction stage, where a final adjudication on the merits has not taken place. The Second Circuit has not, it appears, resolved this question. But it seems appropriate to consider whether Plaintiffs would likely prevail, notwithstanding the Defendants ability to sever, since preliminary relief simply asks the same question ultimately posed at a later stage of the litigation. *See Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 772 (5th Cir. 2025).

irreparable harm.[14] The public is irreparably harmed by Nassau County's infringement of their First Amendment rights and the chilling effects it has on their expressive rights. *Volokh*, 148 F.4th at 82; *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." (quotation omitted)); *Beal*, 184 F.3d at 123 ("Given that this action is a facial challenge to the Rules, the irreparable injury issue and the likelihood of success issue overlap almost entirely, and we need not dwell on the former. A statute that threatens freedom of expression to a significant degree by its nature gives rise to irreparable injury.").

Defendants contend Plaintiffs' censorship is self-imposed and they can still engage in their actions, with only the "minor inconvenience" of having to relocate a few feet away. (Defs.' Opp'n at 15). But as discussed, the RSA significantly burdens Plaintiffs' intended speech without leaving any suitable alternative channels for communication. And Plaintiffs cancelled their planned action, out of fear that the law *may* already be in effect, (Borecky Decl. ¶¶ 35–36), which is evidence of its present chilling effect.[15] *See, e.g.*, *Open Soc'y Just. Initiative v. Trump*, 510 F. Supp. 3d 198, 216

---

[14] It is unnecessary to reach the question of likelihood of success on the merits of the due process claim, because the Court's injunction invalidates the entirety of the RSA.

[15] Defendants contend that Plaintiffs have failed to satisfy the test in *Susan B. Anthony List v. Driehaus*. (Defs.' Opp'n at 15). But *Susan B. Anthony* concerned whether petitioners had alleged a sufficient injury for Article III standing purposes. 573 U.S. 149, 151 (2014). And as for standing—which Defendants do not dispute—Plaintiffs' cessation of planned activities out of fear of prosecution by the County is sufficient alleged injury. *Id.* at 159 (requiring plaintiffs to show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution thereunder." (quotation omitted)).

(S.D.N.Y. 2021) ("The prospect of enforcement under IE[E]PA has caused Plaintiffs not to speak, and hence to forgo exercising their First Amendment rights. Thus, enjoining Defendants from enforcing IEEPA's civil and criminal penalties against Plaintiffs would eliminate this chill and prevent irreparable harm.").

**V. Public Interest**

Given that the RSA is likely unconstitutional, it is also in the public interest to enjoin its enforcement. *See N.Y. Progress*, 733 F.3d at 488 ("[S]ecuring First Amendment rights is in the public interest."). "No public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." *Agudath Israel of Am.*, 983 F.3d at 637.

Defendants' arguments to the contrary are unpersuasive. In what amounts to a repurposing of their government interest arguments, Defendants contend that the balance of equities favors the County because it has a powerful, ongoing interest in protecting its residents from harm when attending religious service. (Defs.' Opp'n at 16–17). An important government interest that is insufficient to demonstrate constitutional validity, cannot tip the equities or public interest in the County's favor. *Sajous v. Decker*, No. 18-CV-2447, 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018) ("The Second Circuit has concluded that, where a plaintiff alleges constitutional violations, the balance of hardships tips decidedly in the plaintiff's favor[.]" (citing *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984))).

## VI. Scope of Injunction

Plaintiffs seek to enjoin the RSA in its entirety and preclude its enforcement against anyone. Having satisfied the preliminary injunction factors for their as-applied and facial challenge, they are entitled to their relief.

Defendants contend that *Trump v. CASA* forecloses "sweeping county-wide injunction[s]." (Defs.' Opp'n at 17). It does nothing of the kind. *CASA* addressed nationwide injunctions, 606 U.S. 831, 837 n.1 (2025), which Plaintiffs do not seek. *CASA* said nothing about county or district-wide injunctions. Defendants' argument is particularly inapt since the RSA only purports to govern speech and conduct taking place at physical locations within Nassau County; the law has no application anywhere else or outside the Eastern District of New York. If Defendants' argument is that the injunction should only be granted to these Plaintiffs, a successful facial challenge permits a full injunction against the law. *See Sisters for Life, Inc.*, 56 F.4th at 407 ("[I]f a statute is not narrowly tailored, it cannot be constitutionally applied to *anyone*, even if a more narrowly tailored statute might still capture a plaintiff's conduct.").[16]

---

[16] Defendants raise two other arguments seeking to avoid a preliminary injunction. Neither has merit. They first contend that the Court should resort to constitutional avoidance doctrines to uphold the RSA. But the constitutional questions are at the heart of the law. And second, they contend they need hearings to press and cross-examine the Plaintiffs about their statements. But this is just a delay tactic, and Defendants have offered nothing specific that they seek to glean from having further hearings or what additional evidence they could provide beyond what was submitted. They had the opportunity to make a motion for early discovery—*see* Fed. R. Civ. P. 26(d)—but did not.

CONCLUSION

For all of these reasons, the motion for a preliminary injunction is granted. Defendants, and their agents, are enjoined from enforcing the Nassau County Religious Safety Act, Local Law No. 6-2025, in its entirety until this case has been finally resolved.

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date: June 18, 2026
Central Islip, New York